PULP WOOD COMPANY, Appellant, vs. GREEN BAY PAPER & FIBER COMPANY, Respondent.

*December 5, 1918—January 7, 1919.*

*Appeal: Law of the case: Interstate commerce: Restraint of trade: Monopolies: Federal statute construed: Destroying competition: Invalidity of contracts: Severability of claims.*

1. The decision of this court on a former appeal, reversing an order sustaining a demurrer to the complaint, and the principles of law then laid down constitute, so far as they go, the law of the case upon a later appeal from the judgment rendered after a trial.

2. In interstate commerce the producer of a commodity is not only entitled, under sec. 1 of the federal anti-trust act (26 U. S. Stats. at Large, 209, ch. 647), to protection against combinations which unreasonably depress the price of his commodity, even though the general public may to some extent benefit by the depression, but is also entitled, under sec. 2 of the act, to protection against combinations which destroy or attempt to destroy the competitive market for his product and compel him to sell it, if at all, to a single concern at a price fixed by that concern, *i. e.* he is entitled to protection against monopoly.

3. The "restraint of trade" mentioned in sec. 1 of said act means only unreasonable or undue restraint; but business or trade monopolies are still offensive to the common law, and under sec. 2 of the act, which makes it a misdemeanor for any person or combination of persons to monopolize or attempt to monopolize "any part" of the trade or commerce among the several states, no such monopoly established by private persons of their own motion can be deemed reasonable or lawful.

4. To bring such a monopoly within the condemnation of the statute it is not necessary to show that pecuniary loss has already resulted either to individuals or to the public; there may in fact have been a temporary benefit. It is sufficient to show that the former competitive market has been destroyed and that it rests within the power of the monopoly to raise or lower prices at will.

5. A combination between pulp-wood purchasing agencies and a large number of paper manufacturers, which attempted to and did establish a purchasing monopoly and fixed the prices in the spruce pulp-wood market of a large part of the upper peninsula of Michigan, destroying the former competitive market, is *held* to have been unlawful under sec. 2 of said anti-trust statute, even though such combination may have produced beneficial results in increasing and making more steady the supply of pulp wood, in preventing ruinous competition and ruthless sacrifice of natural resources, in enabling the paper makers to make larger contracts for pulp wood and extend their field of supply into Minnesota and Canada, in reducing operating expenses, in making the annual supply sufficient and dependable, and in facilitating the readjustment of freight rates.

6. All contracts which formed essential or convenient parts of the machinery of such combination must be held void. Thus, in an action by one of the purchasing agencies against a paper manufacturer for breach of certain provisions of contracts between them by which defendant was to pay, for spruce pulp wood delivered to it, its *pro rata* share of the cost thereof to plaintiff, including expense of operating and interest on the capital used, it is *held* that there can be no recovery for such breach. It being admitted that defendant has paid the reasonable value of the pulp wood delivered to it, the action cannot be considered as one brought to recover the value of goods sold.

7. Claims, embraced in such action, based on defendant's breach of provisions in said contracts relating to hemlock pulp wood cannot be severed from the other claims, although no effort is found to have been made by the combination to control the

output of hemlock. The inclusion of hemlock pulp wood in its contracts being one of the means found necessary or convenient to accomplish the illegal purpose of the combination, the contracts are void in that respect also.

APPEAL from a judgment of the circuit court for Brown county: HENRY GRAASS, Circuit Judge.   *Affirmed.*

This is the second appeal in this action, the first being from an order sustaining a demurrer to the complaint. 157 Wis. 604, 147 N. W. 1058. The case has been tried by the court and judgment rendered for the defendant dismissing the complaint on the ground that the contract (for breach of which this action is brought) is void because contrary to both the federal and state anti-trust statutes.

The contract sued on will be found printed in full in the report of the former appeal and need not be printed here. It will be sufficient now to say that by its terms the plaintiff, a corporation engaged in the business of purchasing pulp wood for others, contracted with the defendant, a paper manufacturing corporation at Green Bay, to use diligence to procure and furnish to the defendant 5,000 cords of spruce, 17,500 cords of hemlock, and 2,000 cords of balsam pulp wood during the year 1905, and the defendant agreed that it would accept and pay for the pulp wood delivered to it under the contract. It appears further by the recitations of the contract that the plaintiff had also contracted to purchase and deliver during the same year to various other paper-making concerns located in the Fox River Valley or its immediate vicinity specified amounts of pulp wood aggregating 116,950 cords, making a total, including that contracted for by the defendant, of 141,450 cords; and the agreement provides that the defendant will accept and pay for its *pro rata* share of all the pulp wood which the plaintiff company shall of necessity deliver in order to operate economically during the season, even though in excess of said 141,500 cords, and will also accept in discharge of the contract its *pro rata* share of the pulp wood which the plaint-

iff is able to deliver during the season, even if the same is less than 141,500 cords. The agreement also provides that the defendant shall ultimately pay for the pulp wood delivered its *pro rata* share of the cost thereof, including all "expense of operating" and seven per cent. interest on the capital employed in the business, payments of a certain base or invoice price per cord being provided for as deliveries are made and a settlement to be had at the end of the season, when the excess or deficiency in the amount already paid as the invoice price is to be determined and made right by return of the overpayment, if any, to the defendant, or the further payment by the defendant of any amount necessary to make up its *pro rata* share of the total expense of operation and interest on the capital employed. The contract further provides that the defendant shall not purchase pulp wood of any other person during the year. The complaint showed that this contract was one of a series of annual contracts of similar content covering the years from 1904 to 1909, inclusive.

It was stipulated on the trial that the defendant had made the base or invoice payments stipulated for during the time covered by all of the contracts and that the aggregate of such payments was all that the total pulp wood actually delivered was reasonably worth on the market.

The action is brought to recover (1) the defendant's *pro rata* share of a large loss resulting from the failure of one Perry to carry out a contract made with the plaintiff in 1903 to cut and deliver spruce pulp wood, it being claimed that such loss was a legitimate part of the cost of producing the pulp wood, and (2) certain claims for damages on account of the refusal of defendant to accept delivery of pulp wood on the contracts; also claims for interest charges upon delayed payments for pulp wood and a claim to recover the difference between the base or invoice price of the wood delivered under the contract of April 14, 1908, and the defendant's *pro rata* share of the cost of getting out and delivering the season's wood.

The action was referred to W. L. Evans to hear, try, and determine, and he made findings to the effect that the contracts in question were void because they constituted a part of a scheme or combination to destroy competition and acquire a monopoly in the purchase and sale of pulp wood in Northern Michigan and Wisconsin and also to control prices and unreasonably restrain trade in pulp wood, to the material injury of the public. He concluded that the contracts were void and offended against the federal and state anti-trust laws as well as against the common law. The findings of the referee were confirmed by the circuit court and judgment rendered for the defendant, from which judgment this appeal is taken.

For the appellant there were briefs by *Hooper & Hooper* of Oshkosh, and oral argument by *Moses Hooper*.

For the respondent there was a brief by *Martin, Martin & Martin* of Green Bay, and oral argument by *P. H. Martin*.

WINSLOW, C. J.    The federal anti-trust act, known as the Sherman act (26 U. S. Stats. at Large, 209, ch. 647), and the Wisconsin statutes bearing on the subject (secs. 1791*j* and 1747*e*) are quoted at length in the opinion on the former appeal in the present case and it is not deemed necessary to repeat them here. Both condemn contracts or combinations in restraint of interstate trade or commerce as well as monopolization or attempts at monopolization of any part of such trade or commerce. These sections were quite fully discussed and construed by this court upon the former appeal, and the principles of law then laid down unquestionably constitute the law of the case so far as they go upon the present appeal. *Ellis v. N. P. R. Co.* 80 Wis. 459, 50 N. W. 397; *Legault v. Malacker,* 166 Wis. 58, 163 N. W. 476.

These principles may be briefly stated as follows: *First,* the contract in question involved interstate commerce, and hence the federal statute is the statute to be applied to the

case, although little, if any, difference is to be observed in the result in the present case whether the state or the federal statutes, or both, apply; *second,* the words "restraint of trade" in the federal statute have the same meaning which they had at common law, namely, acts, contracts, agreements, or combinations which operate to the prejudice of the public interests by unduly restricting competition or by unduly obstructing the due course of trade; *third,* the contract here involved shows some restriction of competition, or some obstruction of trade, but does not show whether the same is undue or unreasonable, hence resort must be had to evidence outside of the contract to ascertain whether it offends the statute; *fourth,* there is nothing intrinsically unlawful in two or more persons appointing a common agent to purchase a commodity which they require or in giving such agent the exclusive right to do their buying; such an arrangement becomes unlawful only when it injures the public by unduly restricting competition or restraining trade; *fifth,* the pulp-wood producer is entitled to protection against combinations which unreasonably depress the price of his commodity, even though the general public may to some extent benefit by the depression.

To these propositions may be added another, which seems to follow necessarily, namely: If, under the provisions of the first section of the federal act, the pulp-wood producer is entitled to protection against combinations which unreasonably depress the price of his product, he must also, under the second section of the act, be entitled to protection against combinations which destroy or attempt to destroy the competitive market for his product and compel him to sell his product, if he sells it at all, to a single concern at a price fixed by that concern, for this is monopoly.

Starting with these fundamental propositions as a basis, it will be well to state here the additional facts which have been added to the case by the proofs.

The complaint showed that the plaintiff had been made the exclusive purchasing agent of pulp wood for twelve paper mills in the Fox River Valley; that the agreement was that each mill should take its proportionate share of the pulp wood which the plaintiff was able to purchase economically during the season, and pay to plaintiff the cost of producing the same, with seven per cent. interest on the capital invested. The only substantial restriction on trade was the agreement by the mills that they would not purchase pulp wood of any other person during the existence of the contract.

The additional facts shown by the evidence will now be stated.

*First.* The plaintiff corporation was one of three pulp-wood supply agencies operating on the same plan (the names of the other two being the Wisconsin Pulp Wood Company and the Northern Paper Company, each acting as purchasing agent for a number of mills (aggregating twenty-five mills in all), and these three agencies during the years in question operated together in the pulp-wood territory in Northern Michigan and Wisconsin, amicably dividing the territory between themselves and by agreement fixing prices.

*Second.* These three corporations or purchasing agencies were each formed by stockholders in some or all of the paper companies which became their respective patrons and the directorates were to a large extent interlocking and worked in harmony. Their contracts with their patrons were all substantially alike and of the same character, so far as the aspects of this case are concerned, as the plaintiff's contracts with the defendant and its other patrons.

*Third.* The plaintiff's patrons were twelve mills in the Fox River Valley consuming by far the greater part of the pulp wood consumed in that valley, which is one of the principal pulp-manufacturing centers in the country. The Wisconsin Pulp Wood Company bought for ten mills, all or

nearly all of which were located in the Wisconsin River Valley; the Northern Paper Company bought for five Wisconsin mills located in the Wisconsin River Valley.

*Fourth.* The referee states in an able and carefully written opinion:

"The evidence shows that the few scattering mills not in any of the three purchasing agencies, such as the mill at the Canadian Soo, at Escanaba, Rhinelander, and two or three others, were an almost negligible factor in the general pulp-wood producing territory of Michigan and Wisconsin. Most of them were able to get their supply at their very doors and did not go into the general market, and those that did were not a very influential factor as compared to the twenty-five mills in the three agencies. So far as the competition of Eastern mills was concerned, Mr. Taylor [plaintiff's purchasing agent] testified that the Eastern people who operated in the West went only into the Duluth market and into Canada."

Fault was found with this statement by the plaintiff's counsel as not being supported by the evidence, but there was unquestionably sufficient evidence to the effect that, so far as spruce pulp wood was concerned, the three agencies gathered a very large percentage, probably approaching, if not exceeding, three fourths of the amount of spruce pulp wood produced in the entire district of Wisconsin, Northern Michigan, and Minnesota. Apparently the percentage must have been considerably greater in the principal spruce-wood district, namely, the district extending from Gladstone eastward to the Soo, for it appears that the mills in the Fox and Wisconsin River Valleys were the logical markets for this territory and that other mills found it difficult to compete with them on account of their geographical advantages of location. Mr. Taylor, the plaintiff's manager, gave as a guess that from two thirds to three fourths of all the pulp wood produced in the territory from which the Wisconsin, Minnesota, and Michigan mills drew their supply was bought by the three purchasing companies. The objection that this

is a mere guess is not very persuasive; Mr. Taylor doubtless had a fairly accurate idea of the success of the efforts of the combination and would have made no "guess" unless he had solid foundation for it.    Tables of statistics showing the total production of spruce in Wisconsin, Minnesota, and Michigan during several of the years in question were put in evidence.    They are not at all convincing.    Not only do they cover the spruce-producing territory of the entire three states, but the one chiefly relied on includes the production of spruce timber as well as distinctive pulp wood.    Even at this, the percentage bought by the three agencies averaged about fifty per cent. for the years 1905, 1906, 1907, and 1909, while for 1908 it was eighty-five per cent.

On the whole, we see no reason to question the truth of the proposition that, so far as spruce pulp wood (the most valuable pulp wood) was concerned, the outside mills were an almost negligible factor in the pulp-wood territory of Michigan and Wisconsin, and that in the district eastward from Gladstone to the Soo this was specially true.

*Fifth.*    In the fall of each year before the lumbering season began, and after the orders for the season had been received from the mills, the three agencies were in the habit of sending agents through the producing districts getting the ideas of producers, and then the executive committee of the three agencies would meet and, after considering the amount of wood required, the business situation, the labor market, and the reports of the agents, would fix the price which the three agencies would pay for pulp wood during the coming season.    The price so fixed was made known to the pulp-wood producers and ruled through the following season, unless it was later found that the price was not high enough to produce the wood, in which case it was raised and all producers given the benefit of the raise.    This rarely happened.

*Sixth.*    After thus fixing the price the three companies would each enter into written contracts with individual producers, hundreds in number, for their respective outputs for

the year.    These contracts were substantially alike, and contained a provision that the purchaser would not sell pulp wood elsewhere until the contract had been fulfilled and *all* the pulp wood delivered and accepted.

*Seventh.*  That part of Northern Michigan lying between Gladstone and the Soo was one of the principal spruce-producing territories in the region covered by the combine, and in this territory the plaintiff was given by its colleagues the exclusive right to purchase during all the years in question except one, when the privilege was given to the Wisconsin Pulp Wood Company.  In this region the White Marble Lime Company, a corporation of Manistique, Michigan, was a large purchaser of forest products, and during the years in which this territory was awarded to the plaintiff it made contracts with the Lime Company to purchase of it all the spruce pulp wood purchased by it in said region, which contracts contained provisions that all spruce pulp wood purchased by the Lime Company should be sold to the plaintiff and that the plaintiff should not buy any such wood in the territory of any other person.

In the year in which the Wisconsin Pulp Wood Company operated in this district it had a similar contract with the White Marble Lime Company.  The evidence amply sustains the conclusion that, in the district named, the result of the combination and the contracts with the White Marble Lime Company was that producers of pulp wood had no competitive market.  They could sell to the White Marble Lime Company or they could keep their product.  Practically they had no choice.  This was the conclusion which the referee reached in these words: "It appears to me very evident that the contracts between plaintiff and defendant, viewed in the light of the actual operations under them, the objects sought, and the results accomplished, brought about a monopolistic control of the pulp-wood industry in that section of the northern peninsula of Michigan covered by the White Marble Lime Company contracts," and he adds: "The

situation created in this territory was exactly what the plaintiff aimed to create universally but accomplished with varying degrees of success; in this territory the system had reached perfection."

*Eighth.* In Door county, Wisconsin, a contract similar to that made with the Lime Company in Michigan was made with one Le Mere, giving him exclusive rights in that county, and another instance appears of the making of such an arrangement at Crandon, Wisconsin, the reason given being that the plaintiff did not like to deal with small producers but rather with large and responsible companies.

*Ninth.* By the establishment of the three purchasing agencies operating at a considerable distance from the mills located in the Fox and Wisconsin River Valleys and by the consequent entire cessation of purchases by the individual mills from producers in their immediate vicinity, the demand for what may be called the home supply of pulp wood has been substantially lessened and the market largely destroyed, or, in other words, the home supply of pulp wood has been conserved.

*Tenth.* The supposed beneficial results of the combination have been to slightly raise and make more steady the supply of pulp wood, prevent ruinous competition and ruthless sacrifice of natural resources; also to enable the paper makers to make larger contracts for pulp wood and extend their field of supply into Minnesota and Canada, to reduce operating expenses, to make the annual supply sufficient and to be depended on, and to facilitate the readjustment of rates of freight.

The plaintiff's argument is substantially this: Even conceding that, by reason of the combination, the producers in the district east of Gladstone were deprived of a competitive market and compelled to sell their pulp wood to the White Marble Lime Company at a price fixed by the combination, still it does not appear that any producer has lost a penny or that the price of paper has been raised. On the contrary, it

appears affirmatively that the effects of the combination have been beneficial to the public because beneficial to the paper mills in the respects last above stated; hence that the restraint on trade cannot be called undue or unreasonable.

The argument has been well and strongly made by counsel for appellant, and if the first section of the federal act stood alone, construed as it has been by the supreme court of the United States, it would not be entirely clear how it could be answered. But that section does not stand alone; it is supplemented by another section directed against another supposed evil. The first section condemns all combinations in restraint of trade, but the legislative branch of the government was not satisfied to stop here. By the second section they proceed further and condemn not merely combinations but persons who monopolize or *attempt* to monopolize "any part" of the trade or commerce among the several states. To say that this second section means the same thing as the first would be to accuse the federal legislature of piling up words to no purpose. Plainly it was intended to add additional territory to the field of unlawful business activity. Restraint of trade was one thing, and a monopoly, while of course necessarily including restraint, was another. There might be restraint without monopoly, but no monopoly without some restraint.

Now, while it is settled by judicial decisions that the "restraint of trade" named in the statutes does not mean every restraint however trifling, but only an unreasonable or undue restraint, we do not understand that it has yet been held, by the court of last resort at least, that there may be a reasonable monopoly established by private persons of their own motion and without authority of law. Monopolies in trade, whether of buying or selling, have been offensive to the common law ever since the time when English kings used them as a means of rewarding favorites or wringing money from a reluctant people. It has been truly said that "the struggle of the English people against monopolies

forms one of the most interesting and instructive chapters in their history." *Slaughter-House Cases,* 16 Wall. (83 U. S.) 36, 105. The common law of England denounced them, but the struggle did not end until the passage of the statute of 21 James I., which declared them void.

The first English colonists came to this country in the midst of that struggle and brought with them their hatred of all forms of monopoly. In the case of *Richardson v. Buhl,* 77 Mich. 632, 43 N. W. 1102, Chief Justice SHER-WOOD expresses the prevailing thought on the subject thus:

"Monopoly in trade or in any kind of business in this country is odious to our form of government. It is sometimes permitted to aid the government in carrying on a great public enterprise, or public work under government control, in the interest of the public. Its tendency is, however, destructive of free institutions and repugnant to the instincts of a free people, and contrary to the whole scope and spirit of the federal constitution, and is not allowed to exist under express provision in several of our state constitutions."

It is not our purpose now to maintain that this indiscriminate condemnation of business monopolies is economically sound or always just. It may be well that the time is approaching, if not already here, when monopolies or business combinations controlling the market (subject, however, to efficient government control) will be found more desirable than unrestrained competition; but that is a question for the lawmaking power to decide, not for the courts. It is sufficient for our present purpose to know that business monopolies are still condemned by the common law and that the federal law in question was unquestionably passed to strongly entrench in the federal field of action this long-established common-law principle and make its application to interstate commerce certain and specific as well as to provide adequate penalties in case of its violation.

Viewing the statute with its historic background, it seems certain that the combination here in question falls within the condemnation of the second section if not of the first.

It is not necessary to show that pecuniary loss has in fact already resulted either to individuals or to the public, in fact there may have been a temporary benefit; it is the fact that the power to fix the buying or selling price of a necessary commodity in a given district has passed into the hands of an individual or a combination of individuals and the former competitive market destroyed that makes the statute active. From that fact alone injury to the public is implied, or rather (under the philosophy of the common law) that *is* a public injury. The material fact is that it rests within the power of the monopoly to raise or lower prices at will, not that it has actually raised or lowered them. *Harding v. American G. Co.* 182 Ill. 551, 55 N. E. 577; 19 Ruling Case Law, p. 10, § 4, and cases cited; Id. p. 37, § 103; *People v. Milk Exchange,* 145 N. Y. 267, 39 N. E. 1062.

These considerations are decisive of the question before us and make it certain that under the facts found by the referee the combination not only attempted to establish a purchasing monopoly in the spruce pulp wood market of Northern Michigan between Gladstone and the Soo, but actually succeeded in accomplishing its purposes during the years in question. It follows that all agreements which formed an essential or convenient part of the machinery of the combination must be held void. The agreement on which this suit is brought is one of them. The provisions of that agreement for the breach of which this action is brought were plainly integral and necessary parts of the scheme of monopoly, without which it would fail. It is an admitted fact that the defendant has paid the reasonable market value of all wood actually delivered to it by the plaintiff under the contract, so this action is not in any true sense brought to recover the value of goods sold, but to recover damages for failure to perform certain provisions of the contract deemed essential to make the combination a success. It is plain that there can be no recovery for the breach of such provisions.

It is argued that the contract is severable in its nature;

that no effort is found to have been made to control the output of hemlock, and that practically all of the items making up the second cause of action relate to hemlock, and that these items may and ought to be severed from the other claims and allowed. We find ourselves unable to agree to this reasoning. There was one combination, not two. The illegal purpose with which it was formed tainted all the means employed which it found necessary or convenient to accomplish that purpose. The inclusion of hemlock pulp wood within its contracts was one of them. We can make no severance.

*By the Court.*—Judgment affirmed.

KERWIN, J., took no part.