NORTHERN WISCONSIN CO-OPERATIVE TOBACCO POOL, Respondent, vs. BEKKEDAL and others, Appellants.

*September 22, 1923—February 12, 1924.*

*Co-operative associations: Tobacco growers' pool: Interference by third person with contracts with grower members: Liability: What interference is malicious: Equitable relief: Injunction: Validity of contracts with members: Who may attack: Public policy: Monopolies: Combinations in restraint of trade: Application of anti-trust laws to co-operative associations: Form of restraining order.*

1. One who maliciously induces another to breach a contract with a third person is liable to such third person for the damages resulting from the breach. p. 581.

2. One acting in good faith may advise another to breach a contract existing between such other and a third person without incurring liability; but where the interference is malicious the intermeddler is liable.   p. 581.

3. The conduct of the defendants, who were tobacco buyers, in organizing a campaign to create dissatisfaction among the members of a co-operative tobacco growers' pool, offering more than the market price to induce them to breach their contracts to deliver their tobacco to the pool, and offering to indemnify them from costs or damages resulting from such breach, being well calculated to bring about the dissolution of the pool, amounted to malicious interference with the contracts between the pool and its grower members.   p. 582.

4. Co-operative associations among farmers are favored by the laws of Wisconsin.   p. 582.

5. Although the plaintiff pool may prosecute actions at law to recover damages from its grower members for breaches of their several contracts to deliver tobacco to the pool, nevertheless the facts that a multiplicity of suits would be required and that the damages sustained by the pool by reason of its inability to deliver tobacco which it had sold would be difficult of proof, furnish a plain situation for equitable interference.   p. 583.

6. In a suit by the pool to restrain the defendants from interfering with contracts between the pool and its members, the defendants could not raise the question of the validity of such contracts, since they have been treated as valid and subsisting by both parties thereto.   p. 584.

7. The defendant dealers could not object that the contracts between the plaintiff and its members were *ultra vires,* since such question could only be raised by the state or by a member of the pool.   p. 584.

8. Defendants were entitled to urge as a defense that plaintiff constituted a monopoly within sec. 1747*e,* Stats. 1921, and to ask for affirmative equitable relief, should it be determined that plaintiff, either by virtue of its contracts with its members or by reason of its business methods, in fact constituted a monopoly or effected an unreasonable restraint of trade.   p. 585.

9. The public policy of the state with reference to combinations in the nature of trusts or conspiracies in restraint of commerce is within the control of the legislature and subject to modification by it.   p. 588.

10. The contract between the pool and its members, whereby the members agreed to sell all tobacco grown by them to the association for five years, the contract to be effective when seventy-five per cent. of tobacco growers in the state had

Northern Wis. Co-operative Tobacco Pool v. Bekkedal, 182 Wis. 571.

signed similar agreements and to be self-renewing from year to year, and which provided for liquidated damages in case of breach, is specifically authorized by sub. 2, sec. 1786e—7, and hence is not to be tested, in determining whether it constituted an unlawful restraint of trade, by the provisions of sec. 1747e. p. 590.

11. The Co-operative Marketing Law, being enacted later than the general anti-trust statute (sec. 1747e), must be considered as modifying such general statute and as legalizing practices which might have been questioned prior to the enactment thereof. p. 590.

*On rehearing:*

12. Unless there is something novel about the subject taking it out of the general rule, the legislature may classify agreements in the nature of trusts, combinations, and monopolies in restraint of trade, condemning some and authorizing others, if there are reasonable and proper economic, political, and social reasons for making the classification. p. 593.

13. The Co-operative Marketing Law is not unconstitutional as denying the equal protection of the laws, contrary to the Fourteenth amendment to the federal constitution. p. 593.

14. To enable one to attack a statute as unconstitutional he must show that the alleged unconstitutional feature of the law injures him, and so operates as to deprive him of rights protected by the constitution. p. 597.

15. An order restraining defendants from interfering in any manner with the contracts of plaintiff or with plaintiff's business matters, and from buying or attempting to buy tobacco from persons having contracted to sell to plaintiff, or from receiving or attempting to receive tobacco under contract, is not invalid as too general and ambiguous, although it places the responsibility on defendants of determining what conduct will constitute an interference. p. 598.

16. The order should, however, be modified to permit defendants to purchase tobacco from those who shall have voluntarily breached their contracts with plaintiff, severed their relations therewith, and withdrawn their membership therein. p. 598.

ESCHWEILER and JONES, JJ., dissent.

APPEAL from a judgment of the circuit court for Dane county: EDGAR V. WERNER, Circuit Judge. *Modified and affirmed.*

This action is brought by the plaintiff to restrain the defendants from interfering with various and sundry con-

tracts entered into by the plaintiff with various tobacco growers in the state of Wisconsin.

The complaint alleges that plaintiff is a corporation duly organized and transacting business as a co-operative association under and pursuant to the laws of the state of Wisconsin; that the defendants *M. H. Bekkedal* and *Lloyd Bekkedal* are copartners transacting business as M. H. Bekkedal & Son, and as such are engaged in buying, sorting, packing, and selling leaf tobacco throughout the entire tobacco-growing area of Wisconsin, their principal place of business being at Viroqua; that the other defendants are employees and agents of M. H. Bekkedal & Son.

That plaintiff is incorporated as a co-operative association for the sole and only purpose of buying tobacco from its members and reselling the same; that the association is organized and operates without profit to its members other than the benefits derived by them from co-operative marketing of their products, and that about 6,500 growers of tobacco in the state of Wisconsin are members of this plaintiff and have each and all signed contracts for the purchase from them of all of their tobacco grown in the year 1922, and in the succeeding years, by the plaintiff.

That the life and existence of the plaintiff depends upon the performance by its members of their contracts to sell and deliver their tobacco to the plaintiff; that plaintiff has contracted to sell and deliver to manufacturers of and dealers in northern leaf tobacco all of the northern assorting tobacco grown by its members and delivered to plaintiff pursuant to said contracts, the value of which is between one and one-half million and two million dollars.

That the cost and expense of operating plaintiff's business is borne by the growers of tobacco, members of the association, and that the cost per pound to the members of the association of transacting its business is very materially reduced in proportion as the number of members who enter into contracts of sale and perform the same is increased.

-That the buying of tobacco from the farmers of Wisconsin has for many years been subjected to abuses, and that the farmers of Wisconsin have been taken advantage of by certain unscrupulous buyers operating in the state of Wisconsin, and that this plaintiff is operating chiefly for the purpose of providing better business methods in the marketing of the tobacco of its members, making it possible for the growers of tobacco to unite their interests in selling their tobacco to better advantage and without the imposition and abuse which have heretofore been suffered by the growers of tobacco because of their lack of organization and lack of adequate facilities for handling and marketing their own tobacco.

That the defendants have conspired together to interfere with the performance of the contracts between the plaintiff and its tobacco-growing members, and are soliciting members to breach their contracts with plaintiff and to sell their tobacco to said M. H. Bekkedal & Son, and that they have purchased tobacco from the members of the plaintiff association well knowing that said tobacco was under contract of sale to the plaintiff, and in furtherance of said conspiracy the defendants have urged members of the plaintiff association to breach their said contracts and have advised them that said contracts were of no force or effect, and have offered and agreed, as plaintiff verily believes, to protect the said growers of tobacco who breached their contracts with this plaintiff against liability to plaintiff for and on account of such breach.

That such interference with the contracts of plaintiff on the part of the defendants is for the purpose of destroying plaintiff by causing dissatisfaction on the part of its members and creating discontent among them so that plaintiff would be unable to perform its contract for the sale and delivery of large quantities of tobacco, thereby destroying the business relations existing between plaintiff and most substantial buyers of northern leaf tobacco in the United States,

thereby impairing and destroying the entire business of plaintiff and ultimately causing it to dissolve its existence and thereby leave its tobacco-growing members in the same unfortunate condition in which they were before the organization of the corporation.

That for the same purpose the said defendants are maliciously and falsely representing to plaintiff's members that the officers and agents of the plaintiff are not dependable or trustworthy, and that the grades established for the tobacco of its members are unfair, and that the prices which the members will receive through the said plaintiff are wholly inadequate, and that they are offering to pay for tobacco of members of the plaintiff prices which they know are more than the tobacco is fairly worth in the open market, and that all of said things are done in pursuance of the conspiracy and design on the part of defendants, and particularly M. H. Bekkedal & Son, to damage, injure, and destroy the business of the plaintiff by destroying its contract relations with its tobacco-growing members.

The prayer is for judgment enjoining the defendants from interfering in any manner with the contracts of plaintiff and with any of the business matters of plaintiff, and, particularly, that they be enjoined from buying or attempting to buy any tobacco from any persons having contracts with this plaintiff and from receiving or attempting to receive from any persons having contracts with the plaintiff any of the tobacco grown by them in the year 1922. Upon this complaint, supported by various affidavits, a temporary restraining order was issued, which was continued until the final determination of the case.

The answer, for the most part, denied the allegations of the complaint so far as the conspiracy and the unlawful conduct pursuant thereto as alleged in the complaint is concerned. The answer then alleges, in effect, that the defendants M. H. Bekkedal & Son have long been purchasers of tobacco in the state of Wisconsin, and that for many years

12] JANUARY TERM, 1924. 577

Northern Wis. Co-operative Tobacco Pool v. Bekkedal, 182 Wis. 571.

many members of the plaintiff association have sold their tobacco to the said Bekkedal & Son, and that any tobacco purchased by them from members of the plaintiff which tobacco was under contract of sale to the plaintiff was purchased by them pursuant to a voluntary offer on the part of the grower, and that said Bekkedal & Son purchased the same in the open market at the fair market value thereof, and that such purchase was pursuant to part of the legal conduct of the business of the said copartnership, and was not induced or brought about by any act of the said copartnership except that it has at all times been willing to pay for such tobacco as was offered to it in the open market the fair market price thereof; that the purchase of said tobacco was not pursuant to any purpose or design on its part to injure the plaintiff, but was made in good faith and for the primary purpose of promoting and conducting its usual business among the customers from whom it has purchased tobacco in the state of Wisconsin for many years past, and that it had no knowledge whether any of said growers had entered into contractual relations with the plaintiff.

The answer further alleged that said partnership has been engaged in the purchase of tobacco in the state of Wisconsin for over thirty years, during which time it has invested large sums of money in such business, and now has invested in warehouses, plants, equipment, and necessary capital to carry on the business in excess of $1,250,000, and that it has large and expensive warehouses at many points in the state of Wisconsin; that it has acquired a valuable element of good will with said growers and established a reputation for business capacity, integrity, and fairness, and that unless said firm can purchase tobacco such as is offered to it the investment in said warehouses and equipment and the good will established by the copartnership will be destroyed and rendered valueless.

The defendants then alleged that the existing contract between the plaintiff and the growers is designed for the

purpose of monopolizing the tobacco crop and limiting the sale of tobacco in the state of Wisconsin to such purchasers of tobacco as may be selected or favored by the organizers and promoters of said plaintiff, and that said contract and the course of business of the plaintiff is for the purpose of excluding from the business of purchasing tobacco in the state of Wisconsin any other persons whatsoever, and that the purpose of the said contract is to enable the managers of said plaintiff to prevent and stifle absolutely any competition among sellers of said tobacco produced in the state of Wisconsin and to enable plaintiff to fix absolutely the terms, prices, and grades for and on which the said tobacco shall be sold, and that the said contract is unlawful and void; that the contract between the plaintiff and the tobacco growers, and the manner in which plaintiff's business is conducted, constitutes an unlawful and unreasonable restraint of trade.

The foregoing facts are also pleaded as a counterclaim, in which the defendants pray for judgment enjoining the plaintiff from claiming or pretending that the contract existing between plaintiff and its members is a valid contract or that it is in force or effect as to the 1922 crop, or that a breach of said contract on the part of the growers will result in litigation to be prosecuted by the plaintiff against such persons selling or delivering their 1922 crop to the defendant, or in any way interfering by claims, advertising, pretensions, or threats with the usual and ordinary course of business of Bekkedal & Son as purchasers of the 1922 crop of tobacco raised in Wisconsin, other than by free and open competition in accordance with the usual rules of law in respect to competition and trade, from entering into further contracts with growers of tobacco in Wisconsin, and from further transacting any business as a corporation or otherwise, or from buying or receiving any tobacco.

The issues thus formed were tried before the court, who made and found findings of fact and conclusions of law. For the most part the findings of fact were in accordance with the allegations of the plaintiff's complaint, and fur-

12]                JANUARY TERM, 1924.              579

Northern Wis. Co-operative Tobacco Pool v. Bekkedal, 182 Wis. 571.

ther, that the plaintiff corporation has not fixed or attempted to fix prices in contravention of any rules of law; that it has not restricted the production of tobacco or attempted to restrict the production of tobacco; that its contracts are not in unlawful restraint of trade; that no conduct of the plaintiff is in unlawful restraint of trade; that said plaintiff corporation is not a combination, trust, or conspiracy in restraint of trade or commerce, in violation of any law of the state of Wisconsin, and that the plaintiff has no adequate remedy at law.

As conclusions of law it was found that the plaintiff is entitled to judgment restraining the defendants from interfering in any manner with any of the business matters of the plaintiff, and particularly from buying or attempting to buy any tobacco grown in the year 1922 by any person who is under contract to sell the same to plaintiff, and from receiving or attempting to receive any tobacco grown in the year 1922, and that the cross-complaint and counterclaim of the defendants Bekkedal & Son be dismissed.

From a judgment entered pursuant to such findings the defendants bring this appeal.

For the appellants there was a brief by *Glicksman, Gold & Corrigan* of Milwaukee, attorneys, and *C. W. Graves* and *J. Henry Bennett*, both of Viroqua, and *M. K. Whyte* of Milwaukee, of counsel; and the cause was argued orally by *Mr. Whyte, Mr. W. D. Corrigan,* and *Mr. Graves*.

For the respondent there was a brief by *Gilbert, Ela, Heilman & Raeder* of Madison, attorneys, and *Aaron Sapiro* of San Francisco, of counsel, and oral argument by *Emerson Ela* and *F. L. Gilbert*.

A brief was also filed by the *Attorney General* and *Alvin C. Reis,* assistant attorney general, as *amicus curiæ,* and oral argument by *Mr. Reis*.

The following opinion was filed November 13, 1923:

OWEN, J. The question which first should be considered is whether the plaintiff is entitled to equitable relief pre-

venting the defendants from interfering with the contracts existing between the plaintiff and its numerous members. It is to be borne in mind that the *Bekkedal* firm has for thirty years been engaged in the tobacco business in this state, during which time it has purchased the tobacco crops of many growers who had become members of the plaintiff corporation and had entered into contracts to sell and deliver their 1922 and four succeeding years' crops to the plaintiff. This situation constituted a serious interference with the *Bekkedals'* usual business, and they freely admitted that they had been unable to purchase the desired amount of the 1922 crop.  Notwithstanding the fact that plaintiff offered to sell them one million pounds of tobacco, they never made any reply to the offer, but, instead, sent out their agents and solicitors, and at the time of the commencement of the action were engaged in inducing growers who were members of the plaintiff corporation and under contract to deliver to the plaintiff their 1922 crop to breach their contracts with the plaintiff and to sell and deliver their respective crops to the *Bekkedals.*  The son, *Lloyd Bekkedal,* testified that it was the intention of the *Bekkedal* firm to go out and try to buy two and one-half million pounds of tobacco from plaintiff's members, and that but for the service of the temporary restraining order they would be "going yet."

The trial court specifically found that the defendants had deliberately solicited persons known by them to be signers of the contracts with the plaintiff to break said contracts, and agreed to indemnify and protect such growers against damage to the plaintiff for or on account of such breach; that they represented to such growers, for the purpose of inducing them to breach their contracts, that the contracts were inoperative, and that they endeavored to create dissatisfaction by telling said growers that the price they were to receive for their tobacco from the plaintiff was too low and that their tobacco was worth more than the plaintiff would pay, and offered and agreed to pay them more for

their said tobacco than they would receive under plaintiff's contracts.

We consider the law well settled that one who maliciously induces another to breach a contract with a third person is liable to such third person for the damages resulting from such breach. *Martens v. Reilly,* 109 Wis. 464, 84 N. W. 840; *Knickerbocker Ice Co. v. Gardiner Dairy Co.* 107 Md. 556, 69 Atl. 405, 16 L. R. A. N. s. 746, and note; *Wheeler-Stenzel Co. v. American W. G. Co.* 202 Mass. 471, 89 N. E. 28, L. R. A. 1915F, 1076, and note; *Swain v. Johnson,* 151 N. C. 93, 65 S. E. 619, 28 L. R. A. N. s. 615, and note; 36 Harvard Law Rev. 663.

Appellants concede the doctrine that where one knowingly induces the servant or employee of another to breach his contract of employment, or where the interference of a third person is from malicious motives, or by the employment of methods not regarded by the law as proper, the party so offending must respond in damages. But they claim that this case falls within the principle that, in the interest of free trade and competition, it is permissible for any one to purchase in the open market products offered to him although the person offering such products for sale may be under contract to deliver all or some of the products to someone else, to which principle they cite *Citizens' L., H. & P. Co. v. Montgomery L. & W. P. Co.* 171 Fed. 553; *Sweeney v. Smith,* 171 Fed. 645, and other cases. It is not to be denied that numerous cases hold that one acting in good faith may advise another to breach a contract existing between such other and a third person without incurring liability, and no doubt that is sound law. Where the interference is malicious, however, the great weight of authority upholds the liability of the intermeddler. There is some confusion in the authorities as to what constitutes a malicious interference; but, without undertaking to review the authorities or to define or fix the limits of conduct amounting to a malicious interference, we do not hesitate to say

that the conduct of the defendants in this case did constitute a malicious interference with the contracts existing between the plaintiff and the tobacco growers.

The defendants knew of the existence of the plaintiff and were cognizant of the fact that the growers of tobacco had very generally become members of the corporation and had agreed to sell and deliver their crops thereto. By reason of this very situation the Bekkedals had been unable to purchase the amount of tobacco which they desired. They saw that their business was threatened by the existence of this corporation. They organized a campaign to scatter seeds of dissatisfaction and discontent among plaintiff's members, offered more than the market price to induce them to breach their contracts with the plaintiff, and offered to indemnify them from any costs or damages which might result from breaches of their contracts.

Co-operative associations among the farmers are favored by our laws. Our statutes provide for their organization. Such associations cannot live when discontent and dissatisfaction is rife among the members. Defendants' plan of campaign was well calculated to ruin the plaintiff and bring about its dissolution, thereby relieving the defendants from undesirable competition. These facts supply the malice necessary to render them liable in damages for their attempts to bring about breaches of the contracts, under the great weight of authority, and even if authority were lacking we should be impelled to the same conclusion.

Liability on the part of the defendants for causing breaches of plaintiff's contracts having been established, the question arises whether it is entitled to the relief of a court of equity in restraining the defendants from further efforts along this line.

The plaintiff has contracts with upwards of 6,500 members. While it may prosecute actions at law to recover damages for breaches of these contracts, it would require a multiplicity of suits, and the damages which it would

sustain by reason of its inability to deliver the tobacco which it had sold to its customers would be difficult of proof in an action against the defendants. These facts furnish a plain situation for equitable interference. *American Law Book Co. v. Edward Thompson Co.* 41 Misc. 396, 84 N. Y. Supp. 225; *Jesse L. Lasky F. P. Co. v. Fox,* 93 Misc. 364, 157 N. Y. Supp. 106; affirmed without opinion in 174 App. Div. 872; *Beekman v. Marsters,* 195 Mass. 205, 80 N. E. 817, 11 L. R. A. n. s. 201.

The contract existing between the plaintiff corporation and its members provided as follows:

"The parties agree that the contract shall be in effect from the time that growers of seventy-five per cent. of the tobacco produced in Wisconsin in 1920 sign similar contracts until June 1, 1927, and that it shall continue thereafter from year to year; subject to the right of either party to terminate liability on June 1st of any year following 1926 by giving notice to the other party at least thirty days before the expiration of such year.

"The association agrees that it will notify the grower as soon as growers of the required acreage, as above stipulated, have signed similar contracts.

"The parties further agree, however, that this contract shall not affect the 1922 crop unless by June 30, 1922, growers of the required acreage, as stipulated above, have signed similar contracts."

The court found that on or before June 30, 1922, a sufficient number of growers of tobacco had signed similar contracts to make all of said contracts operative upon the 1922 crop of tobacco; that notice thereof was given by the plaintiff corporation to its various contracting members, and that the terms and conditions of said contracts had been fully met and complied with so as to make said contracts operative upon the 1922 crop.

Whether or not a sufficient number of growers had signed contracts with the plaintiff to make said contracts operative upon the 1922 crop was the subject of exhaustive inquiry

upon the trial. We are asked to review the evidence upon this point and to set aside the finding of the court in this respect. It strikes us that the question whether these contracts are in all respects technically valid, or whether the contracting parties could, if they were so disposed, defend against them, is a matter with which the defendants are not concerned and which they ought not to be permitted to raise. The contracts were treated as valid and subsisting by both parties thereto. The plaintiff had proceeded on the theory that it had the requisite number of contracts. It so notified all of its contracting members in August, 1922. Not a single one of the members questioned that fact. The plaintiff. proceeded to finance itself and to dispose of the crop which these contracts assured to it. The contracting members planned on delivering their respective crops to the plaintiff corporation in accordance with their agreement. All parties acquiesced in the validity of the contracts. Under such circumstances we are unable to perceive any legitimate reason for permitting a mere intermeddler with relations thus created to assert the right to challenge the validity of these contracts. If the immediate parties saw fit to treat them as legal contracts, defendants' interference with relations thereby created is no less immoral because the grower members might have had a legal defense thereto. This conclusion is supported by *Rice v. Manley,* 66 N. Y. 82, and *Jesse L. Lasky F. P. Co. v. Fox,* 93 Misc. 364, 157 N. Y. Supp. 106; affirmed without opinion in 174 App. Div. 872.

It is also contended that the contract between the plaintiff corporation and its grower members was *ultra vires.* This is another question which the defendants should not be permitted to raise, especially in view of the rule that the question of whether the contracts are *ultra vires* can be raised only by the state or some member of the corporation. *John V. Farwell Co. v. Wolf,* 96 Wis. 10, 70 N. W. 289, 71 N. W. 109.

The appellants next contend that the plaintiff is a mo-

nopoly, and that the manner in which it conducts its business constitutes an unlawful restraint of trade. In the brief filed as *amicus curiæ* by the attorney general it is suggested that the appellants may not raise this question; at least that they cannot ask that the plaintiff corporation be dissolved on the ground that it is an illegal combination under the anti-trust laws, as that is the exclusive province of the sovereign, citing to that proposition *Minnesota v. Northern S. Co.* 194 U. S. 48, 24 Sup. Ct. 598; *Pulp Wood Co. v. Green Bay P. & F. Co.* 157 Wis. 604, 147 N. W. 1058. In 19 Ruling Case Law at page 205 it is said:

"The great weight of modern authority is to the effect that one who has been or will be injured thereby is ordinarily entitled to the equitable remedy of injunction to prevent the carrying out of a contract or combination, to which he is not a party, formed for the purpose of creating a monopoly, maintaining prices, restraining trade or competition, or injuring others in their business contrary to common law or statute, if the damages which he would otherwise suffer are unascertainable, or the resulting injury would be irreparable, and legal remedies are inadequate or a resort thereto would cause a multiplicity of suits."

In *Hawarden v. Youghiogheny & L. Coal Co.* 111 Wis. 545, 87 N. W. 472, it was held that a retail coal dealer who was injured by an unlawful combination between other coal dealers to drive out of business all not members of the combination might maintain an action to restrain the continuation of the operations of the conspiracy.

Sec. 1747e, Stats., provides that any corporation or association who shall either as principal or agent become a party to any contract, combination, conspiracy, trust, pool, or agreement in the nature of a trust or conspiracy in restraint of trade or commerce, shall be liable to any person transacting or doing business in this state for all damages he may sustain by reason of the doing of anything forbidden by this section. While this does not in terms give the injured person a right to equitable relief, in view of the fact that it

586    SUPREME COURT OF WISCONSIN.    [Feb.

Northern Wis. Co-operative Tobacco Pool v. Bekkedal, 182 Wis. 571.

gives such injured party a right of action at law to recover damages it would seem that a court of equity should grant relief where the remedy at law expressly conferred by the statute is inadequate. The authorities sufficiently establish the right of the defendants to urge the monopolistic nature of the plaintiff as a defense to the action as well as the right to ask for affirmative equitable relief if it shall be determined that the plaintiff, either by virtue of its contracts with its members or by reason of its business methods, in fact constitutes a monopoly or effects an unreasonable restraint of trade.

The plaintiff corporation is organized without capital stock pursuant to secs. 1786e—1 to 1786e—17a of the Statutes, providing for incorporation of co-operative associations. Sec. 1786e—2 provides that any number of adult persons, not less than five, who are residents of this state, may organize as a co-operative association for the purpose of conducting any agricultural, dairy, mercantile, mining, manufacturing, or mechanical business on the co-operative plan, or of acting as a selling or buying agent for its members or patrons. Sub. 2, sec. 1786e—7, provides:

"Contracts between any association organized under sections 1786e—1 to 1786e—17, inclusive, and its members, whereby such members agree to sell all or a specified part of their products to or through, or to buy all or a specified part of goods from or through the association or any facilities created by the association, shall, if otherwise lawful, be valid; provided that the term of such contracts does not exceed five years; provided, however, that this requirement shall not prevent such contracts from being made self-renewing for periods not exceeding five years each. A provision in any such contract determining a specific sum to be paid by the member as liquidated damages for breach of said contract shall be valid; provided, that the amount of said liquidated damages does not exceed one fifth of the value of the products which are the subject of the breach."

By virtue of the contract entered into between plaintiff and its members the member agreed to sell to the associa-

tion all tobacco produced by or for him until June 1, 1927; that he would produce and prepare such tobacco for shipment in accordance with the lawful rules of the association, and that he would deliver such tobacco at the time and place and in the manner directed by the association. The member agreed that in the event he violated the contract he would pay the association the sum of five cents per pound for each pound of tobacco produced but not delivered by him according to the provisions of the contract and that said sum might be deducted from any money due from the association to the grower. The contract was to become effective from the time that growers of seventy-five per cent. of tobacco produced in Wisconsin in 1920 should sign similar contracts.

Appellants' contention that plaintiff constitutes a monopoly and an unlawful combination in restraint of trade condemned by sec. 1747e is based on the following considerations: (1) The contract is not to take effect until seventy-five per cent. of the growers of tobacco in Wisconsin signed similar contracts; (2) the provision in the contract that the member will pay to the association the sum of five cents per pound for each pound of tobacco produced but not delivered by him according to the provisions of the contract; (3) that the admitted purpose and conduct of the plaintiff was to combine at once one hundred per cent. of the growers in Wisconsin, and obtain a complete monopoly; (4) that the Wisconsin tobacco crop is peculiarly subject to monopolization because of its distinctive quality; (5) that the plaintiff pool established a price upon its crop which was a monopoly price, as appears by the fact that the price once fixed by the pool was to continue for the whole season, and the prices fixed by the pool were regarded by it, due to its control over the market, as the market price, and anything beyond was classed by it as in excess of the true market price so fixed; (6) that the plaintiff acquired such monopolistic control over the tobacco crop of Wisconsin as to be able to dis-

organize, in its first season, the entire distribution and marketing system of tobacco in this state; and (7) that the plaintiff acquired such monopolistic control over the tobacco crop in Wisconsin as to be able to exercise monopolistic discrimination in the distribution of the Wisconsin tobacco crop among the buyers of tobacco.

A number of the propositions thus laid down by the appellants are not without dispute in the evidence. But, for the present at least, we shall assume these several propositions as verities. From the premises so laid down, appellants proceed with the discussion on the assumption that the situation is governed entirely by the provisions of sec. 1747e, which is our statutory condemnation of contracts or combinations in the nature of a trust or conspiracy in restraint of trade or commerce. It is to be conceded that for a long time the public policy of this state was in accordance with this statutory declaration, and probably such would have been the public policy of the state in the absence of such statutory declaration, as the statute in question adds very little to the condemnation visited upon such agreements at common law. It is not to be denied, however, that the public policy of the state with reference to such combinations and agreements is within the control of the legislature, and that such public policy is subject to legislative control and modification. Thus, in *Pulp Wood Co. v. Green Bay P. & F. Co.* 168 Wis. 400, 412 (170 N. W. 230), it was said:

"It may be well that the time is approaching, if not already here, when monopolies or business combinations controlling the market (subject, however, to efficient government control) will be found more desirable than unrestrained competition; but that is a question for the lawmaking power to decide, not for the courts."

Such combinations and agreements have been condemned by the law because their existence was regarded as prejudicial to the public interest. If in the course of time chang-

ing conditions should give rise to economic views and public opinion wiping out the prejudice hitherto entertained with reference to such combinations and they should come to be regarded as beneficial rather than injurious to the public interest, there is no doubt of the power of the legislature to completely reverse the public policy of the state with reference to such combinations and agreements and to promote rather than suppress the same. So, also, if the legislature should conclude that some combinations are injurious while others are beneficial to the public interest, no reason is perceived why the injurious combinations may not be prohibited and the beneficial combinations encouraged, due regard being had, of course, to the legal requirements concerning proper and germane classifications.

Since the enactment of sec. 1747e, condemning every contract or combination in unreasonable restraint of trade, legislation has been enacted providing for the incorporation of co-operative corporations, or associations, as they are called. The plaintiff is organized under such statutory provisions, secs. 1786e—1 to 1786e—17a, Stats. 1921, inclusive. Such legislation specifically provides (sub. 1, sec. 1786e—2):

"*Any number* of adult persons, not less than five, who are residents of this state, may organize as a co-operative association, for the purpose of conducting any agricultural, dairy, mercantile, mining, manufacturing or mechanical business on the co-operative plan, or of acting as a selling or buying agent for its members or patrons."

Sub. 2 of sec. 1786e—7, already quoted herein, would seem to authorize every provision of the contract here in question. Under contracts so authorized, members may agree to sell all or a specified part of their products to or through, or to buy all or a specified part of goods from or through, the association or any facilities created by the association, and such contracts, if otherwise lawful, shall be valid. Such contracts shall not exceed five years, but they may be made self-renewing for periods not exceeding

five years. The same subdivision also specifically provides that the contracts may contain a provision for liquidated damages in case of their breach. Every provision of the contract here in question which it is claimed constitutes a restraint of trade is specifically authorized by this legislation. This legislation, being enacted subsequent to the enactment of our general anti-trust statutes, must be considered as modifying the scope of the former, and the validity of plaintiff's contracts, or the effect of their operation so far as they constitute a restraint of trade, is not to be tested by the provisions of sec. 1747e or court decisions condemning contracts under similar legislative provisions. This legislation providing for the organization of co-operative associations manifests a clear purpose on the part of the legislature not only to authorize but to encourage co-operative effort along the lines to which the legislation is made applicable and to legalize practices which no doubt were of questionable validity prior to the enactment of such legislation.

The reasons for promoting such legislation are generally understood. It sprang from a general, if not well-nigh universal, belief that the present system of marketing is expensive and wasteful and results in an unconscionable spread between what is paid the producer and that charged the consumer. It was for the purpose of encouraging efforts to bring about more direct marketing methods, thus benefiting both producer and consumer and thereby promoting the general interest and the public welfare, that the legislation was enacted.

We therefore hold that the validity of the plaintiff organization and its operations must be tested not by the former public policy of this state with reference to combinations and agreements in restraint of trade, as declared by sec. 1747e, but by the provisions of the co-operative association statutes. So far as the contract is concerned, it seems to be

in conformity with those provisions. The statute specific-
ally provides that *any number* of persons may organize as
a co-operative association. This language negatives any
legislative purpose to limit the number of persons that may
so organize, and the fact that seventy-five per cent. or
even one hundred per cent. of the tobacco growers of the
state affiliated with this association does not render its
organization illegal or its operations unlawful. It may be
and probably is true that the organization and operation
of this association had a very serious effect upon defendants'
business in the various respects above set forth, but it is to
be remembered that the very purpose of the legislation was
to bring about a different system of marketing, which must
of necessity injuriously affect middlemen (and such is the
*Bekkedal* firm). The effect of the operation of such asso-
ciations upon business in general cannot be considered in
determining the legality thereof or their operations, because
the public policy which formerly condemned them now
encourages their existence and operation. If they have no
effect upon business as heretofore existing and conducted,
then their existence and operation as well as the legislation
promoting them is futile and to no purpose. The effect of
similar legislation upon prior existing public policy is con-
sidered in *Tobacco Growers' Co-operative Asso. v. Jones,*
185 N. C. 265, 117 S. E. 174; *Brown v. Staple Cotton Co-
operative Asso.* (Miss.) 96 South. 849; *Hollingsworth v.
Texas Hay Asso.* (Tex.) 246 S. W. 1068; *Poultry Pro-
ducers v. Barlow,* 189 Cal. 278, 208 Pac. 93, all of which
are in harmony with the conclusion we have reached.

We are not called upon to consider questions of classifi-
cation, as the statute authorizes the formation of co-opera-
tive associations not for the purpose of conducting a par-
ticular or a limited class of businesses, but, by its terms, it
applies to agricultural, dairy, mercantile, mining, manu-
facturing, or mechanical business. This provides a very

wide field for the operation of these associations and relieves the law of any suspicion arising on its face at least of special or class legislation.

Whether the plaintiff association constitutes a monopoly or an unreasonable restraint of trade tested by public policy existing prior to the enactment of our co-operative association legislation would present a most interesting question. But in view of the conclusion we have reached, a discussion of that question would be to no point and would constitute a mere superfluous effort.

It may be that some matters of minor importance have been raised in the briefs to which reference has not been made in this opinion. We desire to give assurance, however, that all questions raised by appellants have been considered, and if they have not been treated here it is because they seemed to be immaterial in our view of the case.

*By the Court.*—Judgment affirmed.

ESCHWEILER and JONES, JJ., dissent.

The following opinion was filed February 12, 1924:

OWEN, J. Upon the motion for rehearing it is earnestly argued that the Co-operative law is unconstitutional because it denies the equal protection of the laws, contrary to the provisions of the Fourteenth amendment of the federal constitution. While this was obliquely suggested upon the argument, the contention was not stressed, and did not seem to be put forth with a great measure of assurance. The earnestness, however, with which it is advanced upon the motion for rehearing merits a response from the court.

The argument, in brief, seems to be that the law is discriminatory in that it authorizes certain classes to enter into agreements in the nature of trusts, combinations, and monopolies in restraint of trade, if they do so under and by virtue of the Co-operative law, while those who are not in

a position to avail themselves of the provisions of that law are prohibited from entering into such agreements. As was pointed out in the main opinion, the subject is one under the control of the legislature. That body may either prohibit such agreements or authorize them. If this be not apparent from the mere statement of the proposition, it is sufficient to say that it is so declared in *Quong Wing v. Kirkendall,* 223 U. S. 59, 63, 32 Sup. Ct. 192. Unless there be something novel about this subject taking it out of the general rule, the legislature may classify such agreements, condemning some and authorizing others, if there are reasonable and proper economic, political, and social reasons for making the classification. *State ex rel. Milwaukee S. & I. Co. v. Railroad Comm.* 174 Wis. 458, 183 N. W. 687.

In order to vindicate the Co-operative law it is not necessary to justify the exemption of farmers from the general anti-trust statute, which was condemned as vicious classification in *Connolly v. Union S. P. Co.* 184 U. S. 540, 22 Sup. Ct. 431. It may be remarked, however, that the decision in that case was made more than twenty years ago, since which time there is abundant evidence of a wide-spread conviction throughout our nation that the farmer is subject to economic conditions which put him in a class justifying special legislative consideration in many respects. It may be doubted whether at the present time the holding in *Connolly v. Union S. P. Co.,* in this respect, would be followed. But we will not pursue this thought except as it may incidentally appear in our following discussion.

Co-operative associations are neither new nor novel to civilization. They are old institutions in many foreign countries, notably in Denmark. It is well known that the United States Department of Agriculture has been active for some years in the encouragement and development of co-operative marketing associations. The War Finance Corporation, another government agency, has encouraged these associations throughout the country. Many acts of

Congress have accorded special consideration to such associations, such as the Income Tax Law, the Sherman Anti-trust Act, the so-called Capper-Volstead Act, approved February 18, 1922, and the Agricultural Credit Bill, approved March 4, 1923. State departments of agriculture throughout the country have urged the formation of such associations and at least twenty states of the Union have adopted co-operative marketing laws. Their function is to enable co-operation among the weaker and more scattered members of society, and this on the theory that the welfare of society as a whole is promoted by enabling the weaker members thereof to co-operate for the purpose of improving their condition, which is humble at the best. It is this theory which has wrought a change of governmental attitude towards the collective efforts of laboring men, which evolution is clearly pointed out in the dissenting opinion of Mr. Justice BRANDEIS in *Truax v. Corrigan*, 257 U. S. 312, beginning at p. 354 (42 Sup. Ct. 124).

That there is an inherent difference with reference to the resulting effect to society between a combination of a strong and powerful few who are able to get together and exercise a complete control over a particular industry or commodity essential to social existence, and a combination of farmers, each weak in his individual strength and power, numbering into the millions and scattered far and wide, is reasonably apparent. The former combination is small, compact, powerful. The inevitable tendency, and too often the plain result, is oppression to society. Any combination of the latter is necessarily weak and impotent, so far as securing a unity of control and action sufficient to result in oppression is concerned. The most that is hoped for from co-operative organizations on the part of the latter is slight improvement in the condition of the agricultural classes, a stimulus to more intelligent effort and encouragement to carry on in a line of endeavor that is essential to human

existence. It is recognized that the welfare of our agrarian population promotes the welfare of the nation. To say that society cannot prohibit combinations which are detrimental without at the same time striking down co-operative associations which are beneficial, is to deny the most fundamental basis of all classification.

A perusal of the Co-operative Marketing Law dissipates any thought that it has for its fundamental purpose the accomplishment or promotion of monopoly. Its dominant purpose is to promote the welfare of its members by stimulating co-operative effort. The law is rather carefully drawn, and many of its provisions may be cited disclosing a legislative effort to restrain the results of the law to the purposes sought to be accomplished. It is not a law to be availed of by those harboring monopolistic purposes. For instance, each member has one vote, and only one vote. Proxy voting is prohibited, except that territorial delegate voting is provided for. This contemplates that the association will be made up of numerous and scattered members. The rate of dividends upon stock is limited to eight per cent. The proceeds from the business of such corporation, after payment of all necessary expenses, are distributed to the patrons (not the members) in proportion to the volume of business transacted by said patrons with the association. The nature of the contracts between the association and its members is clearly defined. The term of such contracts is limited to five years. The number of shares which any person may hold may be limited. The corporation may prescribe that its common stock may be sold only to persons designated and described in the by-laws, and that the stockholder shall lose the power to vote if he ceases to belong to the class of persons designated or described in the by-laws. It is obvious that great and oppressive combinations of capital, constituting the real evil which has caused the enactment of stringent anti-trust legislation, would not find

this law very helpful, and that those having monopoly as their dominant purpose would not choose to take advantage of this law.

Granting that it is possible for a monopoly to result from this law, it is clear that such a result is neither contemplated nor encouraged by the law. Rather there is an apparent attempt to confer benefits upon those who find the law suitable for their purposes, which benefits are to stop short of monopoly. Now granting, also, that in isolated cases the practical operation of the law results in monopoly, or something in the nature of monopoly, can it be said that for that reason the law is unconstitutional, as denying the equal protection of the law? If monopoly results it is lawful monopoly, and the legislature has a right to legalize monopoly. This it has done with reference to all of the public utilities of the state. If in the course of time operation under the law gives rise to oppressive monopolies, the legislature may either repeal the law or fence it with further restrictions, as in its opinion public interest may require. If the law should promote evil rather than wholesome results, it is not necessary that it should permanently endure.

It may be that the law does not apply to every conceivable business. It is available, however, to all persons conducting agricultural, dairy, mercantile, mining, manufacturing, or mechanical business, and, as amended by ch. 433, sec. 1, Laws 1923, now sec. 185.02, Stats. 1923, all businesses that may be conducted in corporate form under ch. 180, sec. 180.01, Stats. 1923. As was said in *Missouri, K. & T. R. Co. v. Cade,* 233 U. S. 642, at p. 649 (34 Sup. Ct. 678):

"These cover a wide range, and do not appear to have been grouped together for the purpose of bearing against any class or classes of citizens or corporations. Unless something of this sort did appear, we should not be justified in holding the act to be repugnant to the Fourteenth amendment."

When we reflect that a state may encourage steam laundries and discourage hand laundries (*Quong Wing v. Kirkendall*, 223 U. S. 59, 32 Sup. Ct. 192); require a license fee of elevators situated on railroad right of way though none is required of elevators not so situated (*W. W. Cargill Co. v. Minnesota*, 180 U. S. 452, 21 Sup. Ct. 423); require a license tax upon persons and corporations carrying on the business of refining sugar and molasses, though excluding planters and farmers grinding and refining their own sugar and molasses (*American S. R. Co. v. Louisiana*, 179 U. S. 89, 21 Sup. Ct. 43); impose a license tax on persons in hiring laborers to be employed beyond the limits of the state, though none is required of those engaged in the business of hiring persons to labor within the state (*Williams v. Fears*, 179 U. S. 270, 21 Sup. Ct. 128); select the business of fire insurance as a special target for anti-monopolistic regulation (*Carroll v. Greenwich Ins. Co.* 199 U. S. 401, 26 Sup. Ct. 66), it is difficult to see how a law like this can be condemned because it denies the equal protection of the laws, at least upon the attack of the defendants in this case.

It is a well recognized principle that in order to enable one to attack a statute as unconstitutional he must show that the alleged unconstitutional feature of the law injures him and so operates as to deprive him of rights protected by the constitution. *Southern R. Co. v. King*, 217 U. S. 524, 30 Sup. Ct. 594; *Standard S. F. Co. v. Wright*, 225 U. S. 540, 550, 32 Sup. Ct. 784; *Plymouth C. Co. v. Pennsylvania*, 232 U. S. 531, 544, 34 Sup. Ct. 359. If the *Bekkedals* are engaged in the numerous pursuits to which the Co-operative law is applicable, they have a perfect right to avail themselves of the provisions of the law, and if their only complaint is that they would like to create a monopoly but cannot, they are upon a precarious footing in a court of law.

The contention of the appellants in support of their motion for rehearing cannot be sustained.

Appellants urge a modification of the restraining order which restrains them from "interfering in any manner whatever with the contracts of the plaintiff, and from interfering in any manner whatever with any of the business matters of the plaintiff, and particularly from buying or attempting to buy any tobacco from any persons who have contracted to sell the same to the plaintiff, and from receiving or attempting to receive any of the tobacco grown in the year 1922 by any person who is under contract to sell the same to the said plaintiff." It is claimed that the order is in such general and ambiguous terms that it imposes upon the appellants an unreasonable responsibility in being obliged to determine for themselves just what conduct will constitute an interference with the business and contracts of the respondent. While it may be true that the order as drawn imposes this responsibility upon the appellants, it is just as true that a court cannot look into the future and divine all of the practices which might be resorted to, to interfere with respondent's business, and an order which attempted to detail the various acts and practices prohibited would necessarily be construed as permitting all not specifically prohibited, and deny to the respondent the full and complete remedy to which it is entitled. We think the order must necessarily be in general terms.

There is one respect, however, in which it is considered the order should be modified. If a member should voluntarily sever his relations with the pool by breaching his contract and withdrawing his membership therein and placing his tobacco for sale upon the market, no reason is perceived why appellants should be denied the privilege of buying his crop. To that extent and for that purpose the injunctional order or judgment is amended by inserting after the words above quoted the following:

"Providing, that these restraints shall not prohibit the defendants from purchasing tobacco from those who shall have voluntarily breached their contract with respondent,

severed their relations therewith, and withdrawn their membership therein."

As so modified the judgment is affirmed. It is considered that this modification shall not affect the question of costs. Costs will be taxed in favor of respondent.

*By the Court.*—Motion for rehearing denied, with $25 costs.