ARKANSAS COTTON GROWERS' CO-OPERATIVE ASSOCIATION *v.* BROWN.

Opinion delivered April 13, 1925.

1. AGRICULTURE—CO-OPERATIVE ASSOCIATIONS—CONTRACTS. — Acts 1921. p. 153, authorizing the organization of associations for co-operative marketing of farm products, (by § 6, subdiv. g) impowers such associations to make contracts for sale and future delivery of agricultural products.

2. CORPORATIONS—BY-LAWS.—The by-laws of a corporation evidence the contract between it and its members or stockholders, and govern transactions between them.

3. AGRICULTURAL—CO-OPERATIVE ASSOCIATIONS—SALES FOR FUTURE DELIVERY.—The contract of a member with a co-operative marketing association authorizing the association to "resell" cotton sold to it by its members *held* to authorize the association to make contracts for the sale and future delivery of cotton, such sales being authorized by the statute and by-laws of the association and in conformity to the usages of the cotton trade.

4. AGRICULTURAL—CO-OPERATIVE ASSOCIATIONS—SALES FOR FUTURE DELIVERY.—Acts 1921, p. 153, in so far as it exempted members of a co-operative marketing association from individual liability for the debts of the association, did not restrict the power of the association to contract for the sale and future delivery of cotton.

5. GAMING—SALE FOR FUTURE DELIVERY.—A contract of sale for future delivery of cotton which the seller expects to acquire by purchase, though speculative, is not a gambling contract.

6. AGRICULTURE—VALIDITY OF PLAN OF MARKETING ASSOCIATION.—Though the plan of a co-operative marketing association organized under Acts 1921, p. 153, to effect the orderly marketing of the cotton crop throughout the year, instead of dumping it during the short gathering season, may result in loss to the association by reason of mistakes of judgment in the sale of cotton for future delivery, this does not render this plan illegal or improvident.

7. AGRICULTURE—MARKETING ASSOCIATION—BREACH OF CONTRACT.—Refusal of a member of a co-operative marketing association, organized under Acts 1921, p. 153, to deliver all of his cotton to association, pursuant to his contract with it, *held* a breach of such contract.

8. EQUITY—JURISDICTION—Equity has jurisdiction to grant relief where legal remedies are inadequate.

9. INJUNCTION—ENFORCEMENT OF CONTRACT WITH MARKETING ASSOCIATION.—Acts 1921, p. 153, § 17, providing that, in the event of a breach of a marketing contract by a member, this association shall be entitled to an injunction and to a decree of specific performance, is not unconstitutional as enlarging the jurisdiction of chancery.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

*Sapiro, Levy & Hayes, Moore, Smith, Moore & Trieber,* and *Clayton & Cohn,* for appellant.

*T. M. Mehaffy* and *J. W. House, Jr.,* for appellee.

McCULLOCH, C. J.   The General Assembly of 1921
enacted a statute authorizing the organization of associa-
tions, as bodies corporate, to promote and regulate co-op-
erative marketing of farm products.   Acts 1921, p. 153.
The design of the statute is fully stated in the caption,
which reads as follows:   "An act to promote, foster and
encourage the intelligent and orderly marketing of agri-
cultural products through co-operation, and to eliminate
speculation and waste; and to make the distribution of
agricultural products as direct as can be efficiently done
between producer and consumer; and to stabilize the mar-
keting problems of agricultural products."   The statute
seems to be in a form which has become standard, and has
been enacted in many of the States, the enactment of such
legislation being manifestly prompted by the universal
urge to promote prosperity in agricultural pursuits.
There has been much discussion of the plan in the deci-
sions of the courts of the various States where it has
been adopted, and the general view expressed is that the
statute should be liberally construed in order to carry
out the design in its broadest scope.

The statute authorizes the organization of corpora-
tions to carry on the business of marketing the farm
products of their members, and declares that associa-
tions thus formed "shall be deemed non-profit, inasmuch
as they are not organized to make profits for themselves,
as such, or for their members, as such, but only for their
members as producers."   Such an association is pro-
hibited from handling the agricultural products of any
non-member.   The pertinent clauses of the section defin-
ing the powers of an association are as follows:

"(a).   To engage in any activity in connection with
the marketing, selling, harvesting, preserving, drying,
processing, canning, packing, ginning, compressing,
storing, handling or utilization of any agricultural prod-
ucts produced or delivered to it by its members; or the
manufacturing or marketing of the by-products thereof;

or in connection with the purchase, hiring, or use by its members of supplies, machinery, or equipment; or in the financing of any such activities; or in any one or more of the activities specified in this section. No. association, however, shall handle the agricultural products of any non-member.

"(b). To borrow money, and to make advances to members.

"(c). To act as the agent or representative of any member or members in any of the above-mentioned activities. * * *

"(g). To do each and everything necessary, suitable or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the objects herein enumerated, or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and, in addition, to exercise and possess all powers, rights and privileges necessary or incidental to the purposes for which the association is organized, or to the activities in which it is engaged; and, in addition, any other rights, powers and privileges granted by the laws of this State to ordinary corporations, except such as are inconsistent with the express provisions of this act; and to do any such thing anywhere."

Appellant is an association organized pursuant to the terms of the statute referred to, and articles of incorporation were adopted as prescribed by the statute. One of the provisions of the articles of incorporation reads as follows:

"To do each and every thing necessary, suitable or proper, in the judgment of the directors of the association, anywhere throughout the world, for the accomplishment of any of the purposes or the attainment of any one or more of the objects herein enumerated, or which shall, at any time, appear conducive to or expedient for the interests or benefits of the association and the members thereof, and to contract accordingly."

By-laws were adopted which contain the following pertinent provisions:

"Section 4. To make and enter into agreements with spinners, buyers or others for the sale, marketing or consignment of the cotton grown by members of the association or the products therefrom.

"Section 5. To carry out the marketing contracts of the association and growers in every way advantageous to the association representing the growers collectively."

Contracts were entered into between appellant association and its members, beginning with the year 1922 and continuing from year to year, as new members could be secured. The contract with all the members was of the same form, and provided that the association should buy, and the member, who was designated as the grower, should sell and deliver to the association, all of the cotton "produced or acquired by or for him in Arkansas" during the period of five years. The first series of contracts, and the one under which the association dealt with appellee, specified the years 1922, 1923, 1924, 1925 and 1926. The first section of the contract reads as follows:

"Arkansas Cotton Growers' Co-operative Association Marketing Agreement.

"The Arkansas Cotton Growers' Co-operative Association, a non-profit association, with its principal office at Little Rock, hereinafter called the association, first party, and the undersigned grower, second party, agree:

"1. The grower is a member of the association, and is helping to carry out the express aims of the association for co-operative marketing, for minimizing speculation and waste, and for stabilizing cotton markets in the interest of the grower and the public, through this and similar organizations undertaken by other growers."

The contract provided that the contracting member, or grower, should not sell cotton to any one except the association, and that all cotton should be delivered,

immediately after picking and ginning, to a public warehouse for the order of the association, and that the warehouse receipts should be delivered to the association, as well as the bills of lading when shipped. Other provisions of the contract read as follows:

"5. The association shall pool or mingle the cotton of the grower with cotton of a like variety, grade and staple delivered by other growers. The association shall classify the cotton, and its classification shall be conclusive. Each pool shall be for a full season.

"6. The association agrees to resell such cotton, together with cotton of like variety, grade and staple, delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions, and to pay over the net amount received therefrom (less freight, insurance and interest), as payment in full to the grower and growers named in contracts similar hereto, according to the cotton delivered by each of them, after deducting therefrom, within the discretion of the association, the costs of maintaining the association, and costs of handling, grading and marketing such cotton; and of reserves for credits and other general purposes (said reserves not to exceed two per cent. of the gross resale price). The annual surplus from such deductions must be prorated among the growers delivering cotton in that year on the basis of deliveries.

"7. The grower agrees that the association may handle, in its discretion, some of the cotton in one way and some in another; but the net proceeds of all cotton of like quality, grade and staple, less charges, costs and advances, shall be divided ratably among the growers in proportion to their deliveries to each pool, payments to be made from time to time until all accounts of each pool are settled.

"8. The association may sell the said cotton within or without this State, directly to spinners or exporters, or otherwise, at such times and upon such conditions and terms as it may deem profitable, fair and advantageous

to the growers; and it may sell all or any part of the cotton to or through any agency, now established or to be hereafter established, for the cooperative marketing of the cotton of growers in other States throughout the United States, under such conditions as will serve the joint interest of the growers and the public; and any proportionate expenses connected therewith shall be deemed marketing costs under paragraph 6.''

The domicile and place of business of appellant association is at Little Rock, where its operations have been carried on. The association secured a large number of members, who contracted to deliver cotton, and has been functioning in accordance with the statute and the terms of its by-laws since the time of its organization.

Appellee is a farmer in Pulaski County, and became a member of the association in the year 1922, and entered into the form of contract above referred to. He had on hand a considerable quantity of cotton of the crop of 1921, and this was delivered to the association for sale.

Appellee instituted this action against appellant in the chancery court of Pulaski County, alleging that appellant had wrongfully and negligently and without his approval sold sixty-four bales of his cotton at less than the market price, causing injury to him in the sum of $4,949, and he prayed for a recovery of that sum as damages. He further alleged that appellant association had wrongfully and without legal or contractual authority adopted the plan of selling cotton for future delivery, and was persisting in said plan, in violation of its contract, and prayed for a cancellation of his contract with appellant.

In the answer, appellant denied that it had been guilty of any negligence or misconduct in the sale of appellee's cotton, or that it had in any manner broken the contract, but, in a cross-complaint against appellee, it is conceded that a plan of operation had been adopted whereby contracts were entered into with buyers for

future sales and deliveries of specified kinds and quanti- ties of cotton, but it was denied that this method of doing business was in conflict, either with the statute authorizing the organization of the corporation or with the contract entered into between the corporation and appellee and its other members. In the cross-complaint it is alleged that appellee had produced thirty-six bales of cotton, twenty-seven of which had been delivered to the association under appellee's contract, but that he had refused to deliver the other nine bales, and was about to sell the same to other parties, in violation of his contract. The prayer of the cross-complaint was that appellee be enjoined from disposing of the cotton other- wise than by delivering it to appellant under his contract, and that appellee be required, by decree of the court, to specifically perform his contract. On the hearing of the cause the court found against appellee on his claim for damages, and refused to grant him relief by canceling the contract. No appeal has been prosecuted from that part of the decree. The court also denied relief to appel- lant, and dismissed its cross-complaint for want of equity, and an appeal has been prosecuted to this court from that part of the decree.

The questions presented on the appeal are therefore whether the contract has been broken, and, if so, by whom, and, if broken by appellee, whether or not appel- lant is entitled to equitable relief by injunction and by specific performance of the contract. The decision of the case turns primarily on the question whether or not appellant is authorized, under its contract with the mem- bers, to enter into contracts with buyers for the sale and furture delivery of cotton.

It is undisputed that appellant claims the right to make such contracts as a part of its plan, and that it has entered into such contracts with buyers in some instances for the sale of cotton before it was actually delivered to appellant by the members. If these contracts for future delivery are unauthorized, then such acts on the part of

the association constituted breaches of its contract with members, and the association is not entitled to compel performance on the part of its members.

The party to a contract who commits the first breach is the wrongdoer, and thereby absolves the other party from performance. This is elemental. We proceed, then, to determine whether or not the contract between appellant and its members authorized sales of cotton for future delivery.

The evidence adduced in the case shows that sales made by appellant were for stipulated prices above the New York Cotton Exchange quotations on the day thereafter named by the sellers, who had the privilege, at any time before the first day of the stipulated month governing the quotations, to call the date of the sale and thereby fix the price. It seems that this method of sale is designated in trade parlance as sales "on call," and the price is fixed by the price of cotton on the New York Cotton Exchange on the day on which the call is made, plus a stipulated price, or basis, above the staple and grade upon which the prices are based on the New York Exchange.

We think there is scarcely any doubt that the statute authorizes contracts for sale and future delivery of commodities. Indeed, we do not understand that counsel for appellee seriously contend that no such authority is found in the statute. Subdivision g of § 6 appears to confer ample authority upon the association for the "accomplishment of any of the purposes or the attainment of any one or more of the objects herein enumerated, * * * and to contract accordingly." It calls for no excessive degree of liberality in the construction of the statute to hold that this provision authorizes the association to do all the things enumerated in the statute, and also to enter into contracts for the doing of the same. In other words, it contains, not only authority to sell the products committed to its control, but to enter into executory contracts for such sales. There is no

other way, it seems to us, to interpret the language, "to contract accordingly," and any other interpretation would render the language meaningless. Nor can there be any doubt that appellant's articles of incorporation and its by-laws authorize executory contracts for sale of commodities. One of the subdivisions of the articles of incorporation, which is hereinbefore quoted, is in almost the precise language of the statute authorizing the corporation to do all the things necessary "and to contract accordingly," and one of the sections of the by-laws hereinbefore quoted expressly authorizes the association to "enter into agreements with spinners, buyers or others for the sale, marketing or consignment of the cotton grown by members of the association." Now, when we come to interpret the language of the contract itself between the association and the members, we should do so in the light of the statute which authorizes it, and the articles of incorporation and the by-laws which govern the operation of the association. In fact, it is settled law that the by-laws of a corporation evidence the contract between it and its members or stockholders and govern the transactions between them. The contract between the association and its members does not expressly confer the power to make an executory contract with purchasers for future delivery, neither does it prohibit such a contract. It authorizes the association to "resell such cotton, together with cotton of like variety, grade and staple, delivered by other growers under similar contract, at the best prices obtainable by it under market conditions." The only fair interpretation to be given to this language is that it was meant to authorize sales of cotton in the manner authorized by the statute and by the by-laws of the association. Any other interpretation would be a very restricted one and would not evince the liberality with which we should view remedial operations of this kind, which are wholly for the benefit of the members of the association. Moreover, we should interpret the meaning of the word

"resell" in the light of general customs of trade and business with reference to the sale of the commodity dealt with, and the proof is overwhelming that the general method of doing business in the cotton trade is to contract for sale and future delivery and upon terms generally the same as adopted by appellant. The proof in the case is that the business of selling cotton in quantities throughout the season cannot be carried on in any other way, for manufacturers of cotton products nearly always prefer to buy on future delivery. It is proved also, and not denied, that the producers of cotton and the manufacturers do not deal directly with each other, and that the necessities of the trade require the intermediation of merchants and brokers, between whom contracts for sale and future delivery are customary. In order for a marketing association to do business and carry out the purposes for which it is organized, it must, to more or less extent, conform to the usages of trade and to ordinary business methods. It is an old adage that "it takes two make a trade," and, in order for sellers to find purchasers, they must conform, to some extent, with the wishes of the latter in the method of carrying on negotiations and in consummating sales. It is fair to assume that the word "resell" in the contract was used with reference to these methods of doing business in the cotton trade, and, as the general method was to sell for future delivery, we should interpret the language of the contract as conferring authority upon the association to conform to those usages. Good reasons are stated in the evidence why the spinners and other manufacturers of cotton products prefer to buy cotton on contracts for future delivery and why sellers of cotton are compelled, in order to do business successfully, to conform to those preferences and methods established by the buyers. The manufacturers want to know in advance when and where they will get cotton of the desired staple and grade, and, even before cotton is gathered and ready for delivery, they find it necessary to make terms for

a supply. And those engaged in selling cotton, in order to hold the trade of their customers, must conform to those preferences and must provide the desired way of supplying the cotton. In no other way, the evidence shows, can the business be successfully operated. The inference is therefore strong that the parties, in framing the language of the contract before us, intended to give the association the authority to conform to those usages of trade and to make sales in the manner customary to the usual trade. Other courts, in interpreting this contract, have held that it authorizes sales for future delivery. *Kansas Wheat Growers' Assn.* v. *Schulte,* 113 Kan. 672, 216, p. 311; *Northern Wisconsin Co-op. Tobacco Pool* v. *Bekkedal,* 182 Wis. 571; 197 N. W. 936. No cases holding to the contrary are cited.

One of the arguments made against this interpretation of the contract, and the one which seems to have largely influenced the chancellor, is that there is possibility of a breach of such a contract on the part of the association by reason of inability to make delivery of cotton under such a contract, thereby incurring liability for a breach, and that the statute contains an express provision that the members shall not be liable for the debts of the association in excess of the sums remaining unpaid on membership fees or subscriptions to capital stock. The argument is that, since the association is non-profit bearing and the members are not liable for debts, there is necessarily no authority to incur obligations which might result in liability for damages. This argument, we think, flies right in the face of the statute itself, which expressly authorizes the association to do all the things that are enumerated in the statute, including the selling of commodities, and to contract therefor. It is our duty to reconcile these provisions of the statute, and, in doing so, we must assume that the lawmakers, by exempting the members from individual liability, did not intend to restrict the power of the association to make contracts. The lawmakers, in framing this statute, did

so upon the theory that the association would perform
its contracts, and not break them, so as to incur liability,
and authority was granted for creating an expense
fund, out of which incidental losses and expenses might
be paid.

In interpreting the statute and the contract we are
not dealing with the question of abuse of power by the
association, but with the question of extent of power to be
properly exercised, and, in solving the question, we must
assume that the lawmakers intended to confer a power
to be rightly exercised. If the power is abused by the
officers and agents controlling the management of the
association, then there is ample remedy in the courts for
the correction of such abuses.

Again, it is argued that contracts of sale for future
delivery constitute gambling transactions, and, being
unlawful, it is not to be presumed that the lawmakers
intended to authorize such acts or that the parties
intended to contract therefor. The answer to this argu-
ment is that contracts of this character do not constitute
gambling transactions. They contain no element of
wager. The ordinary form of contract for sale of cotton
on future delivery, as disclosed by the evidence, is as fol-
lows: The seller holds or expects, by purchase or other-
wise, to acquire for sale a quantity of cotton of a given
grade and staple, and he finds a purchaser with whom
he makes terms of sale. This occurs, for instance, in
September or October, and he enters into a contract for
the sale of a given number of bales of that grade and
staple, the price to be fixed according to the quotations
for December delivery on the New York Cotton Ex-
change, on any day thereafter, to be named by the seller.
This is termed a sale "on call," and the seller has the
right, under the contract, to "call" the sale on any day
he chooses prior to the final day of delivery on December
contracts. The Cotton Exchange quotations are based
solely on cotton of a single grade and staple, that is to
say, middling cotton, 7/8 inch staple. If the cotton to be

sold and delivered is above or below that grade and
staple, the parties agree on a price above or below the
Exchange quotations, so as to cover the difference
between the price of the Exchange quotations and the
price of the higher or lower grade of the cotton
which is the subject-matter of the sale. The
contract stipulates the quantity and the grade and staple
of the cotton to be delivered, and, if it is of bet-
ter grade than that quoted on the Exchange, the
parties agree upon the difference. That is termed the
"basis." As an illustration: If the parties agree that
the cotton delivered is worth 200 points, or two cents
per pound, more than the kind of cotton quoted on the
Exchange, they agree upon that much advance price
above the quotations on the day the sale is called by the
seller. Now, there is an element of uncertainty as to the
fluctuations of the market between the date of the con-
tract and the date of delivery on December contracts, and
it involves, to a more or less extent, a matter of specula-
tion as to whether the seller will obtain the price which
he hopes to get for his cotton, but, as before stated, there
is no element of wager in the contract. The choice is
with the seller to determine, before the final day of deliv-
ery, when he will "call," and thereby fix the price
definitely according to the Exchange quotations. The
result would be the same if he held his cotton without
obligation to sell, hoping to get a higher price on a later
date, and he thereby takes a chance of the market declin-
ing. There is that much element of speculation in all
business transactions where there is a chance of a decline
or advance in the market. The seller of any commodity
may, with propriety, exercise his judgment as to the best
time to sell, and he does not lay himself open to any
implication of wagering. A farmer with a bale of cot-
ton or a load of wheat or potatoes, hoping to obtain the
highest price for his product, may be uncertain as to the
best time to sell, and may, in indulging that hope, post-
pone the sale to a future date, and yet he is not engag-

ing in a wager. The same may be said with reference to the fluctuations in the basis upon which sales are made. On account of weather conditions, there may be fluctuations in the basis upon which cotton is sold, so that the margin of difference between the fluctuations on the Exchange and the market value of the particular grade and staple of cotton which is the subject-matter of the sale may widen, so that the seller, under the contract, would get less for his cotton than he would have gotten if he had waited until the day of delivery to fix the basis. But, as before stated, this is not a wager, even though it contains an element of uncertainty. Cotton is sold by producers indirectly to the manufacturers solely on grade and staple. There is a demand for the different kinds of grades and staples because some kinds are used for one purpose in the manufacture of products, and some for another. Sometimes there is a shortage of certain grades and staples and an excess of others, and, in consequence, the scarcity of the one grade advances the price abnormally, and there is a corresponding decline in the other grades and staples which are more abundant. In other words, the price of one grade and staple of cotton may advance and another be at the same time on the decline. This is not the case in regard to Exchange quotations, for they are, as before stated, all based on a single grade and staple. All of these uncertainties are taken into account in selling cotton, and the business necessarily involves that much element of speculation. This kind of a transaction must not be confused with the business of dealing in futures, for, in the latter case, no actual delivery of the cotton is in contemplation of the parties. The one character of transaction is legitimate, though it involves an element of uncertainty, whilst the other is purely a wager based on the advance or decline of cotton, without the parties intending actually to sell and deliver. The distinction has been clearly recognized and stated by this court and by the Supreme Court of the United States. This court, in passing upon the question of the validity of contracts for future delivery, said:

"But this is not what is commonly known as dealing in futures. This phrase has acquired the signification of a mere speculation upon chances, where the grain, cotton or stock dealt in exist only in imagination, and where no delivery is contemplated, but the parties expect to settle upon the difference in the market." *Fortenbury* v. *State,* 47 Ark. 188. The Supreme Court of the United States, in declaring the validity of a sale for future delivery, said: "And the fact that, at the time of making a contract for future delivery, the party binding himself to sell has not the goods in his possession and has no means of obtaining them for delivery, otherwise than by purchasing them after the contract is made, does not invalidate the contract." *Clews* v. *Jamison.* 182 U. S. 461.

Attention is also called to the fact, shown by the evidence, that appellant lost heavily on one of its contracts for future delivery, on account of inability to make delivery in accordance with the contract, thereby incurring liability for damages, and this is urged as a reason why that kind of business is too hazardous to justify the association in indulging in it. In September, 1923, the association contracted to sell to certain buyers in the east 500 bales of cotton of a certain grade and staple on the basis of 225 points on December quotations, subject to the seller's call, and, on account of failure to get from its members enough cotton of that kind, the association was able to deliver only 350 bales. Cotton advanced rapidly, and the association suffered damage in the sum of about $6,000 on account of breach of the contract. There was another transaction of like character on which the association suffered a loss of $250. It is explained by witnesses that this occurred on account of the sudden and rapid depreciation in the grade of cotton, caused by bad weather, and that for that reason less of the required grades was obtained, and the association did not receive a sufficient quantity of cotton to comply with the contract. The conditions were exceptional, and the same result may or may not occur again. The exercise

of better judgment and more careful and frequent estimates of the condition of the crop during the gathering season may serve to obviate or to minimize the extent of such results. At any rate, that is one of the incidents of the business, and it is the duty of those in charge of the management of the association to do all that can be done to prevent such loss. The fact that this loss did occur does not characterize the business as being so hazardous as to bring it within the denunciation of wrongdoing, or characterize the general plan as unsuccessful. If the management is poor, the remedy is with the members of the association themselves, who have it within their power to change the management, or, if the managing officers and agents are derelict in their duties, and, by neglect or otherwise, cause loss to the association, they can be held accountable. Occasional losses are incident to any business, for no scheme is so perfect as to absolutely avoid them. Where the losses occur merely as an incident of the business and not as the result of negligence on the part of the managing officers and agents, such losses, to that extent, reduce the net returns from the sale of cotton and lessen the benefits enjoyed by the members. The plan, of course, contemplates the selection of officers and agents who are men of experience in the business and of good judgment, so that losses may not occur, or, at least, that the danger may be minimized. The general plan must not be denounced as illegal or improvident merely because mistakes of judgment may have occurred or possibly may occur again in the future. The plan may or may not be perfect. It is scarcely possible to devise a business plan of mathematical exactness or which affords absolute immunity from misadventure and loss, and the question of completeness of the plan is not involved in this controversy. Manifestly it has been designed by those who are, or should be, well informed as to the nature of the business so as to bring the best results. At any rate, it was designed to work for the benefit of

farmers who produce cotton and other agricultural prod-
ucts, and those who go into it do so voluntarily. There
are inherent difficulties in the marketing of cotton which
should be obviated, if possible. This plan contemplates
the orderly marketing of cotton throughout the whole
year, instead of forcing it on the market during the short
gathering season, thereby preventing what is termed
"dumping." It is well known that, when the gathering
season begins, the price of cotton is established, and is
generally fairly well stabilized for a time, until the cotton
is open and is gathered and goes to market with such
rapidity that the market is overstocked, and a decline in
the price results, until the crop is all marketed by the
farmer and gets into the hands of speculators or legiti-
mate dealers in cotton, and then it advances, but the
farmer gets no benefit from the advance. As a general
rule, farmers are in debt to a more or less extent when
the gathering season comes on, and they are unable,
acting alone, to hold their cotton for better prices.
Under the plan of this association, the producers group
themselves together, money is borrowed by the associa-
tion and advanced to the members on their cotton, at
a low rate of interest, and the sale of the product is
distributed throughout the whole year instead of being
dumped on the market during a short period. The effort
to bring about better results is at least to be commended.

Our conclusion is that the plan is not illegal and not
beyond the scope of the contract, hence it cannot be
stricken down by the judgment of a court. This leads to
the conclusion that no breach of the contract was com-
mitted by the association, but that, on the contrary,
appellee broke the contract by refusing to deliver all of
his cotton in compliance therewith.

This brings us to the question whether or not the
remedy sought by appellant is available. It is contended
that the chancery court does not possess jurisdiction to
prevent a breach by injunction and thereby compel
specific performance of the contract. The statute creat-

ing the association contains an express provision for such relief, but it is contended that this statute constitutes an attempt to enlarge the jurisdiction of the court, which is beyond the power of the lawmakers. We do not agree to this view, for it has always been within the jurisdiction of courts of equity to grant relief where legal remedies are inadequate, and it is evident that, by reason of the peculiarity of the co-operative marketing plan, any legal remedy would be wholly inadequate. The only remedy at law would be a suit to recover damages, but this remedy is inadequate, for the reason that the recovery of damages for a failure to deliver cotton would not repair the injury done if a substantial number of the members should refuse to deliver cotton. This would thwart the whole scheme and render it abortive. In that event the amount of damages recovered and distributed among the persistent members would not compensate for the loss caused by the failure to obtain the better price which it is expected will result from co-operative marketing. The statute making this equitable remedy available is not an enlargement of the jurisdiction of the chancery court, for it merely brings the remedy within the jurisdiction of the court as it existed prior to the adoption of our Constitution. *Marvel* v. *State*, 127 Ark. 595. There are cases cited in the brief of appellant which support the view that the chancery court has jurisdiction to grant the relief prescribed by the statute.*

The decree of the chancery court is therefore reversed, and the cause remanded with directions to

---

* The following cases are cited in appellant's brief: *Oregon Growers' Co-op. Ass'n.* v. *Lentz*, 107 Ore. 561; *Kansas Wheat Growers' Ass'n.* v. *Schulte*, 113 Kan. 672; *Tobacco Growers' Ass'n.* v. *Jones*, 185 N. C. 275; *Texas Farm Bureau Cotton Ass'n.* v. *Stovall*, (Tex.) 253 S. W. 1101; *Washington Cranberry Growers' Ass'n.* v. *Moore*, 117 Wash. 430; *Brown* v. *Staple Cotton Growers' Co-op. Ass'n.*, 132 Miss. 859; *Northern Wis. Tobacco Pool* v. *Bekkedole*, 197 N. W. (Wis.) 936; *Hollingsworth* v. *Texas Hay Ass'n.* 246 W. (Texas.) 1068. (Rep.).

enter a decree in favor of appellant for the relief prayed for.

HART and HUMPHREYS, JJ., dissent, not because the plan is illegal, but that the transaction is beyond the scope of the contract.

### SUPPLEMENTAL OPINION.

McCULLOCH, C. J. We are asked by attorneys representing other interests than those of the parties to the present litigation—interests which will likely be involved in subsequent litigation—to withdraw from the opinion the paragraph which states as applicable to the present case, the elemental principle that the "party to a contract who commit the first breach is the wrongdoer and thereby absolves the other party from performance."

It is urged that this application of the principle is unnecessary to a decision of the case and should be withdrawn so as not to affect future litigation in which its application may be invoked.

Upon reconsideration we have concluded to grant the request and confine the decision to the effect that appellant has not, in its methods of business, broken the contract by transcending its powers under the statute, or under its articles of association, or under its contracts with members, and that it is entitled to the relief prayed for in its cross-complaint.