Young *v.* Westark Production Credit Association.

5-70                                             257 S. W. 2d 274

Opinion delivered April 27, 1953.

*Bates, Poe & Bates,* for appellant.

*Hardin, Barton, Hardin & Garner,* for appellee.

*G. V. Head,* Amicus Curiae.

WARD, Justice. Appellants, as residents of Scott County, had for several years borrowed money from the Westark Production Credit Association. The Credit Association is an agricultural credit agency created under the Farm Credit Act of 1933, 12 U. S. C., § 1131 *et seq.,* and makes short-time loans to farmers under the terms of that Act and its own bylaws, rules and regulations promulgated thereunder.

On October 27, 1950, appellants gave to the Association their note [due November 5, 1951] for $6,400 to take up a balance which they owed it and to obtain additional funds, and secured the note by a mortgage on their farm and a chattel mortgage on approximately 70 head of livestock, certain feed, farm implements and a truck.

Although not mentioned in the note or the mortgages, an officer of the Association arranged a suggested schedule of payments in 1951 as follows: April, $250; July, $1,000; and in November, $1,105, $2,500 and $1,500. In each instance the number and kind of livestock were indicated to be sold to make the payments. Also, though not mentioned in the note or mortgages, there was an

understanding, as contended by appellants, that the Association would advance them additional funds from time to time to buy feed for livestock. On December 6, 1950, the Association advanced appellants an additional $400 on their note, and in like manner $600 was advanced on January 15, 1951.

On January 28, 1952, appellants still owed a balance of $4,363.01 on their total indebtedness of $7,400 and interest, and on February 1, 1952, the Association filed suit to foreclose.

By way of answer and cross-complaint appellants raised the following defenses:

(a) They were required to purchase 122 shares of stock at $5 par value per share in the Association;

(b) The Association promised to accept the stock at par value on any balance of indebtedness;

(c) The Association had refused to furnish them with a copy of its by-laws;

(d) They had paid into court the amount sued for, and asked to have value of stock [$610] offset against balance of indebtedness; and

(e) The Association had promised to make additional advances to buy feed for stock and failed to do so, forcing them to sell at a loss of $500.

Appellee denied making the promises with reference to offset of stock and additional loans and further stated that, had such a promise been made with reference to an offset, it would have been ultra vires under § 1131g and 1131e, Title 12 U. S. C. of an Act of Congress June 16, 1933, and denied being under any obligation to make advances.

Appellants contend for two items of relief, both of which were denied by the trial court. One is to have the value of their stock offset against the balance of their indebtedness, and the other is to recover $500 damages.

*Stock Offset.* It appears to us that if appellants are to prevail on this item they must do so on one of three

grounds: (a) the Farm Security Act of 1933 heretofore mentioned requires such offset; (b) the by-laws of the Association require it; or (c) the Association is bound [to grant such offset] by promises made by its officers to appellants. We do not think appellants' contentions can be sustained on either ground.

(a) The pertinent parts of the Farm Security Act are found in 12 U. S. C., § 1131.

Subsection "g" reads:

"Borrowers shall be required to own at the time the loan is made, class B stock in an amount equal in fair Book value (not to exceed par), as determined by the Association to $5.00 per $100.00 or a fraction thereof, of the amount of the loan. Such stock shall not be cancelled or retired upon payment of the loan but may be transferred or exchanged as provided in § 1131e of this title."

Subsection "e" reads:

"No class B stock or any interest therein or right to receive dividends thereon, shall be transferred by act of parties or operation of law except to another farmer borrower or an individual eligible to become a borrower, and then only with the approval of the directors of the association."

From the above it clearly appears that the administrative act not only does not compel or authorize the retirement of stock upon payment of a loan but actually forbids it.

(b) The provision of the by-laws on which appellants rely for an offset is § VI (I)3, which reads as follows:

"Any stockholder who becomes ineligible to borrow from the Association because of a change in its territory, because he changes his farming operations to the territory of another Association, or because of his application for a loan which the association is not authorized to make, may with the consent of the Board of Directors, surrender his class A or class B stock for retire-

ment and cancellation at the fair book value thereof (not to exceed par); *provided* that such consent may not be given by the Board of Directors until notification has been received by the association that a loan to the holder of said stock has been approved by another association created under the Farm Credit Act of 1933. In no case shall the aggregate fair book value (not to exceed par) of the stock so retired and cancelled exceed the value of the class B stock to which the holder has subscribed in the other association.''

Appellants contend that they became ineligible to borrow from the Association and, therefore, under the above-quoted section, they should have been allowed to offset their stock, but we do not agree. The section reveals three things that make a borrower ineligible, viz: (1) if the Association changes its territory; (2) if the borrower changes his location; or (3) if the Association is not authorized to make the kind of loan he wants. It is only under the last-mentioned circumstance that appellants base their claim to ineligibility. The facts on which appellants rely, in our opinion, do not justify their contention in this connection. On October 27, 1950, appellants borrowed $6,400; on December 6, 1950, they were advanced an additional $400; and on January 15, 1951, they were advanced another $600. Both of these advances were made in connection with the original loan and were secured by the same mortgages. On March 3, 1951, the Association refused appellants' application for an additional advance of $350, and it is this refusal which appellants say rendered them ineligible. We do not think this state of facts brings appellants' contention within the spirit or the meaning of § VI (I)3 quoted above. It is self evident that appellants were eligible for the original loan of $6,400 and it would be unreasonable to say they could change their status at any time [during the life of the original loan] by making demands for additional advances which the Association did not wish to make and which it was not legally bound to make.

There is another good reason why appellants could not demand an offset in the manner here attempted even

if they were otherwise within the above section of the by-laws, which section states that stock may be surrendered "with the consent of the Board of Directors." No such consent was here shown.

(c) Appellants insist they were entitled to the offset because the Association had [through its officers] promised it. We do not think the testimony justifies this conclusion. Aside from the testimony of appellant, Young, which was indefinite on the specific terms of an offset, appellants rely principally on the testimony of a former secretary of the Association. In effect he stated the Association had always retired stock [of a borrower] when it could not meet the member's credit requirement, but he also stated there were rules to govern and that it was necessary for the Board of Directors to act. It is, moreover, apparent from the testimony of appellant, Young, that he must have been familiar with the operations of the Association and also that stock in the Association was not always retired when a loan was paid by one of its members. He had done business with the Association over a period of 10 or 12 years, during which he had paid off numerous loans without having his stock retired. The by-laws of the Association were a part of his loan transaction. In *Arkansas Cotton Growers' Coop. Ass'n v. Brown,* 168 Ark. 504 (at p. 513), 270 S. W. 946, 1119, this Court said:

"In fact, it is settled law that the by-laws of a corporation evidence the contract between it and its members or stockholders and govern the transactions between them."

The law presumes that appellants knew the provisions of the by-laws of the Association. See *Benes* v. *Supreme Lodge,* 231 Ill. 134, 83 N. E. 127, 14 L. R. A., N. S. 540; *Bookman* v. *R. J. Reynolds Tobacco Co.,* 138 N. J. Eq. 312, 48 Atl. 2d 646; and *Holford* v. *National Aid Life Association,* 177 Okla. 284, 58 Pac. 2d 588.

Appellants say they were not given a copy of the Association by-laws but it does not conclusively appear that they made demand for a copy and that the Association wilfully or fraudulently refused to comply.

*Damages.* It is the contention of appellants that they should have been awarded damages because the Association had promised to furnish ample money [under the original loan agreement] to feed out all his hogs and that it failed to carry out this agreement, forcing them to sell part of their hogs early and at a loss of $500. We do not agree with this contention.

The original loan for $6,400 was made October 27, 1950, and advances thereunder were made of $400 and $600 on December 6, 1950, and January 15, 1951, respectively. Although the Association was not bound by the original loan note or the mortgages given as security or by any other writing to make unlimited advances, or any advances, to appellants, they again contend that the Association was bound to do so by oral promises of certain officials.

Even if such promises had been made they could not bind the Association. The matter of extending credit involved questions of judgment and discretion, and parol evidence was not admissible to vary the written contract. See *Zearing* v. *Crawford, McGregor & Camby Co.*, 102 Ark. 575, 145 S. W. 226, and *Lane* v. *Smith,* 179 Ark. 533, 17 S. W. 2d 319.

Moreover, the testimony does not justify the conclusion that unlimited credit was promised, even though it be conceded that some advances were contemplated. Appellants rely strongly on a letter written January 10, 1951, by the Assistant Secretary-Treasurer in which it was said to Mr. Young: ''In the event you should need additional funds, we would be pleased to have you communicate with us.'' Just five days later $600 was advanced to appellants, but, as we think, this letter was not a definite promise to advance appellants $350 more on March 3, 1951, or any other sums.

The record shows that on January 20, 1951, the Association wrote Mr. Young to the effect that he would not be advanced any more money and that he would be expected to meet his payments schedule. He therefore knew it would be useless to apply for additional funds in March.

In accordance with the views expressed above, the decree of the trial court is affirmed.