[No. 24706. Department Two. February 1, 1934.]

OLYMPIA MILK PRODUCERS ASSOCIATION, *Respondent*, v. BEN HERMAN *et al.*, *Appellants.*[1]

[1] Reported in 29 P. (2d) 676.

*Frank C. Owings,* for appellants.
*Yantis & Brodie,* for respondent.

TOLMAN, J.—Acting under the Co-operative Marketing Act, chap. 115, Laws of 1921, p. 357, Rem. Rev. Stat., § 2878 *et seq.,* the Olympia Milk Producers Association was incorporated in July, 1932, by a number of Thurston county dairymen. Appellant Ben Herman, acting on behalf of the community composed of himself and his wife, entered into a written contract with the association covering the milk and cream to be produced by him, dated December 1, 1932. Herman complied with the terms of the contract until the end of March, 1933, and then ceased to do so. He thereafter continued to produce milk and cream as before, but has, at all times since, refused to comply with the contract or deliver his product to the association.

This action was instituted to restrain the defendants Herman from disposing of their dairy products to any other than the plaintiff association, to compel a specific performance of the contract and for liquidated damages as provided in the contract. After a trial on the merits, findings of fact favorable to the plaintiff were made, and a decree followed enjoining the defendants, during the term of the contract, from disposing of their milk and cream to any one other than the plaintiff association, directing them to specifically perform the contract, and awarding liquidated damages against them in the sum of $13.90. From this judgment, the defendants have appealed.

The facts are not now in dispute, and but three ques-

tions of law are raised in this court. Appellants contend that the contract here involved is against public policy and void because (1) of the supposed possibility of a state wide monopoly, and (2) because of the duration of the contract, and also (3) that, by a discriminatory method of dealing with its members the association has itself breached the contract.

The first question seems to be the one chiefly relied upon, and for an understanding we must consider the terms of the act, the articles of incorporation, the by-laws of the association, and the contract between the association and the producers.

The so-called Co-operative Marketing Act has been upheld by this court in a number of cases: *Washington Cranberry Growers Ass'n v. Moore,* 117 Wash. 430, 201 Pac. 773, 204 Pac. 811, 25 A. L. R. 1077; *Washington Co-operative Egg & Poultry Ass'n v. Taylor,* 122 Wash. 466, 210 Pac. 806; *Pierce County Dairymen's Ass'n v. Templin,* 124 Wash. 567, 215 Pac. 352; *Grays Harbor Dairymen's Ass'n v. Engen,* 130 Wash. 169, 226 Pac. 496; *Washington Wheat Growers' Ass'n v. Leifer,* 132 Wash. 602, 232 Pac. 339. Hence, appellants do not here directly attack the act itself, but rather the wording of the several written instruments here involved, and what might possibly be done under them, especially under the so-called monopolistic features of the contract.

Article II of the articles of incorporation, which describes the objects of the association and the powers to be vested in it, contains no words limiting the activities of the association to Thurston county or to any territory less than the state as a whole. The by-laws provide that any person in the state who is engaged in producing dairy products shall be eligible to membership, and contain other provisions indicating

no territorial limitation upon the activities of the association. The contract entered into between the association and the producing members provides for the control of all milk and cream produced upon any land, operated or controlled by the producer, within the state during the life of the contract. So that, so far as the terms of the several instruments are concerned, there is no territorial limitation less than state wide.

From all of this, appellants argue that a state-wide control of the production of milk and cream would manifestly create a monopoly such as is forbidden by § 22, Art. 12, of our state constitution.

The test to be applied, it is argued, is not what is actually done, but that which may or might be done under the terms of the several instruments; and to support this argument, numerous authorities are cited, among them being 13 C. J. 425 and 481, and *Delbridge v. Beach,* 66 Wash. 416, 119 Pac. 856.

The rule is a familiar one to which we most heartily adhere, but we think that, in its application, the court must be guided by practical considerations; or, in other words, what may or might be done theoretically will not be considered as controlling unless, in actual practice, it is a reasonable possibility.

"And agreements whose tendency is to establish a monopoly are void, although they may not in the particular case destroy competition or enhance prices. The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of its courts. An agreement, of course, will not be declared void as against public policy when it is expressly authorized by a statute." 13 C. J. 425.

The legislature has, by the act of 1921, declared the public policy of this state in the matter of the cooperative marketing of agricultural products, and we

have many times sustained the act as not being repugnant to the constitutional inhibition against monopolies. The legislative act does not confine such organizations to any limited area; and where, as here, we can plainly see that a perishable product is involved, which depends upon a local market naturally limited by distance and time consumed in transportation and not at all by the political subdivisions of the state, we are bound to uphold the legislative purpose.

Though the argument here takes a different form, in legal effect it is the same argument which we refused to follow in our former cases. As in *Washington Cranberry Growers Ass'n v. Moore, supra,* the plain purpose here is to secure an orderly marketing, a uniform price, and to avoid flooding the one local market available, so that the price may be maintained at a fair and reasonable level. It is impracticable and therefore impossible to interest producers in becoming members unless they are likewise interested in the local market. The natural flow of products to the nearest market limits the scope of the association more exactly and more completely than could be done by any language written into the contract.

We conclude from the record before us that, from a practical standpoint, there is no possibility that respondent can establish a monopoly even in the local market, much less a state-wide monopoly.

The second question is based upon the language of the contract fixing its duration:

". . . for a period of ten years from the date hereof, and from year to year thereafter continuously; *Provided, however,* That the dairyman may cancel this contract two years after the date hereof by giving notice in writing to the association", etc.

Section 15 of the Co-operative Marketing Act, among other things, provides:

"The association and its members may make and execute marketing contracts, requiring the members to sell, for any period of time not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association." Rem. Rev. Stat., § 2892.

Clearly, the contract here under consideration is good for a period of ten years from its date; and whether or not the language which purports to continue it in effect thereafter is binding, cannot in any way affect the present situation. If that language be ineffectual, then it is surplusage only, and surplusage does not vitiate. If it be effectual the courts will enforce it when the time comes. In the meantime, the act may be repealed or amended, and we cannot undertake to decide questions which may never arise.

■ It appears that, out of one hundred twenty members of the association, there are a few who were, at and before the time they became members, both producers and retail distributors of dairy products. These members became bound by the same contract as the appellants and all other members. That contract, among other things, provides:

"The association may take said milk so prepared, from the dairyman's premises and transport said milk to the association's depot and there weigh and test the same; but unless the association elects to transport said milk for the dairyman it shall not be required to do so, and unless the association elects to transport said milk it shall be delivered to the depot of the association by the dairyman or to such other place as the association may from time to time direct . . .

"It is understood by the dairyman that the association is composed of a large number of dairymen in Thurston county, Washington, all of whom have entered or shall hereafter enter into a contract with the association similar to this contract, and that the

purpose of the association and of this agreement, among others, is to maintain and increase to the greatest efficiency the association as a selling agent for its members; that to accomplish this purpose it is necessary that all of said dairymen pool their said milk in order to give the association the largest possible selling power; that it may be desirable and expedient for the association, from time to time, in order to secure for the dairyman the largest possible net returns for his product, to enter into contract or contracts to furnish certain persons, firms or corporations, certain and definite quantities of milk and milk products at stated times covering stated periods during the continuance of such contract or contracts; that the association can make such contract or contracts only upon the strength of and in reliance upon the strict and faithful performance by the dairyman of the terms of this contract on his part to be fulfilled; therefore, as an inducement to the association to undertake the performance of the services contemplated by this contract, the dairyman hereby stipulates and agrees that he will not sell or dispose of his milk or dairy products to or through any person, firm or corporation other than the association, without the approval of the association, during the life of this contract.''

. Under these provisions, the producer-distributor members were permitted to continue to deliver the milk produced by them to their retail customers, reporting the amounts and paying to the association upon the quantities so delivered at the rate of $1\frac{1}{2}\cancel{c}$ per pound of butter fat. By this practice, in effect, the producer sold his product to the association and repurchased at an advance to supply his customers, and while the contract is not very clearly drawn, it recognizes the right of the association to direct the place of delivery, and it also recognizes the right of the member to dispose of his milk or dairy products otherwise than to the association with the approval of the association.

That being so, it must be presumed, in the absence

of any showing to the contrary, that the arrangement was a fair one, tending to preserve the market and to give the association proper compensation, making the arrangement just and fair to all of its members. A similar practice was upheld by this court in *Washington Co-operative Egg & Poultry Ass'n v. Taylor, supra,* and it now may be considered settled law that, in the absence of arbitrary action, unfair discrimination, fraud, or something of like nature, the general control conferred upon the association by the contract will not be interfered with by the courts.

We find no error, and the judgment is affirmed.

BEALS, C. J., BLAKE, GERAGHTY, and MAIN, JJ., concur.

[1]Reported in 29 P. (2d) 675.