CONNECTICUT MILK PRODUCERS ASSOCIATION vs.
BROCK-HALL DAIRY COMPANY, INCORPORATED,
ET ALS.

MALTBIE, C. J., HINMAN, BANKS, AVERY and BROWN, Js.

Argued January 8th—decided March 4th, 1937.

*Ralph O. Wells* and *William S. Locke,* for the appellants (defendants).

*Arthur W. Countryman, Jr.,* for the appellee (plaintiff).

MALTBIE, C. J.  This action when it came to trial had resolved into an interpleader wherein the defendant Dairy Company, having certain money in its possession, pleaded its willingness to pay it either to the plaintiff or to a group of some two hundred persons, represented by a committee of five, who were cited in as additional defendants and to whom we shall hereafter refer as the defendants.  The plaintiff is an organization of milk producers, each of whom entered into an agreement with it under which the milk produced by him was sold and delivered to dealers, under contracts which the Association made with them.  The Association made certain assessments upon its members based upon the amount of milk each delivered to the dealer with whom he dealt.  In accordance with the provisions of the contracts between the Association and its members, and the Association and the Dairy Company, the Dairy Company withheld, in making payments to the producers who delivered milk to it, the amounts of the assessments against them and the money so withheld is the subject-matter of this action.  The Association claims the money as constituting valid assessments upon its members.  The defendants claim it upon the ground that the assessments were not valid and hence the money is due them as a part of the payments for the milk they delivered. The issue then is, were the assessments valid?

In order to become a member of the Association a producer had to enter into a marketing agreement with it, and the Association made agreements with dealers

in which they undertook to accept milk from certain producers whose names were given in schedules attached to the agreements. The agreement between the Association and its members, called a "Membership and Sales Agency Agreement," provided that the member appointed the Association "his sole and exclusive agent to sell, market, or otherwise dispose of all milk and dairy products owned or controlled by [him]" and gave it authority to sell those products "in its own name to such parties and at such prices, terms, and conditions as the Association shall consider to be to the best advantage of all [its] members;" the member agreed to deliver his products to the Association or such shipping stations, milk plants, creameries or other places as it might from time to time direct; the member gave the Association authority to collect in its own name the money due to him for products sold by it but it might authorize a dealer to whom products were delivered to remit in whole or in part directly to the member; the Association agreed to sell the products of the members to such persons and at such terms and conditions as it considered to be for the best advantage of the members and to pay to the members the proceeds less certain costs and expenses of conducting the business of the Association, "including such amounts as may from time to time be allocated to reserve funds, all as determined by the Board of Directors" of the Association; it was given the right to establish certain differentials; it might "blend" the proceeds from the sale of the dairy products of any member with those received from like sales of the products of other members and "distribute such blended proceeds less charges, as above specified, by a uniform method applicable to all members," the differentials established not, however, to be included in the blended proceeds;

the agreement contained a provision as follows: "The Association hereby guarantees that the Member shall be paid for all milk and dairy products delivered by Member and accepted by the Association hereunder," if notice was given to it in writing by the member of his failure to receive payment; and the agreement was to be continuous in operation unless terminated as of the first day of April in any year by notice given between the first and fifteenth day of the preceding February.

The agreements between the Association and the dealers provided as follows: Certain classifications of the milk to be delivered were established; the Association agreed to sell to the dealer and the dealer agreed to buy milk produced by the members whose names appeared in a schedule attached to the contract; the Association agreed to supply the Class 1 or fluid milk requirements of the dealer during the term of the agreement and to use its best efforts to supply milk for the Class 2 needs of the dealer; the dealer agreed to purchase through the Association all such fluid milk as his business should require for his Class 1 needs and further agreed to purchase his Class 2 needs through the Association so far as it was able to furnish the same; but if the Association was unable to supply the dealer in full he could obtain additional supplies elsewhere by agreement with the Association and nothing in the agreement was to deprive the Association of the right to allocate milk supplies by mutual consent or to tender additional supplies to the dealer; the milk was to be delivered in accordance with arrangements made by the producers and dealer and approved by the Association; within twenty days after each payment period the dealer was to render an account to the Association showing the quantity of milk sold or used by the dealer in each class and the aggregate

amount deductible as provided in the agreement; the Association might at any time furnish the dealer with statements of all fees, dues and assessments due and unpaid to the Association from members delivering milk to it, and upon receipt of such statement the dealer was to deduct the total amount shown to be due from each producer from the payment thereafter becoming due to him and remit the money to the Association, and the dealer was also to remit monthly to the Association by separate check amounts equivalent to three cents per hundred pounds of milk delivered and certain other amounts to be contributed by the dealer, to be used with funds of the Association for advertising milk; and these agreements were to run for the period of one year, terminating on March 31st.

We shall not follow the defendants into the evidence for the purpose of finding facts or drawing inferences which the trial court was not requested to include in the finding. The material facts relevant to the claims presented to us as stated in the finding, with such corrections as the defendants are entitled to have made, are these: The prices to be paid by the dealers to the producers were determined for the various classes from month to month by the state milk control board. Be fore April 1st, 1934, each dealer pooled the milk received from the producers with whom it dealt and paid each, not upon the basis of the amount of the milk delivered by him which actually went into the various classes, but upon the basis of the percentage of the entire amount of pooled milk which was used within those classes. The larger dealers, equipped to manufacture milk which could not be sold as fluid milk, into butter, cheese, ice cream and like products, known as processing the milk, accepted substantially more milk than they could market as fluid milk, processing the excess. This was done at the request of the Associa-

tion in order that the excess milk might not be thrown upon the market. The effect of the acceptance by these dealers of this excess milk, on which the return was less than on that sold as fluid milk, was, under the pooling method in use, to decrease the percentage of the milk received by the dealers which was sold as fluid milk, with the result that the producers delivering to them received a smaller return than producers who delivered to smaller dealers who were not equipped to process milk, and who did not, therefore, receive more milk than they could deal with without using that method.

On April 1st, 1934, a new arrangement for payment by the dealers to the producers went into effect. The system of pooling milk continued, but in determining the amount which each producer should receive the percentage of the pooled milk sold as fluid milk was no longer applied to the amount of milk the producers actually delivered to the dealer, but the milk control board fixed a quota of milk for each producer, the percentage of pooled milk sold by the dealer as fluid milk was determined upon the basis of the total quotas of all producers delivering to him, and the producer received an amount determined by applying this percentage to his quota; and further provisions were made which required the producer to deliver at least 75 per cent. of his quota and established a lower rate of compensation for milk delivered in excess of the quota. The effect of this might be that the average price received by a producer would be less if he exceeded his quota than if he kept to it or within 25 per cent. under it. This method was designed to get production more in line with market needs.

Prior to April 1st, 1934, there was considerable criticism of the acceptance by the dealers who processed milk of amounts greatly in excess of that which they

could sell as fluid milk. As a result, certain of these dealers notified the Association that they would cease to receive some of the milk they had been taking. The milk which would be rejected would be the last "loads" which they had previously accepted, a "load" being the milk collected by a single truck from a group of producers in a certain neighborhood. The Association could find no market for this milk and it threatened to become "homeless." The Association persuaded the dealers who processed milk to continue to receive this "homeless" milk under an arrangement that payment for it should be made separately, to the Association and not the producers, at the price of milk used in processing. The Association then added to the money so received from its reserve fund a sufficient amount so that payments to the producers for certain percentages were made at the established rates for fluid milk in the higher classes and the balance at the prices paid for processed milk, the percentages being fixed by the directors according to the average of milk sold in the particular class throughout the State. For two months, October and November, 1934, certain milk which had been in a lower class of fluid milk was treated in the same way as "homeless" milk, which resulted in a higher return to the producers for this milk. The effect of the arrangement made with the dealers to take this "homeless" milk, was that, by dealing with the processed milk separately and not including it in the pool, the percentage of milk in the pool sold as fluid milk was increased and so the return to producers whose milk went into the pool was larger and a market was provided for the "homeless" milk, the producers being paid for it, through the use of funds of the Association, approximately at the same rate as was paid for milk which went into the pool.

The by-laws of the Association provided: "The ex-

penses of the Association, including such amounts as the Board of Directors may from time to time allocate to a reserve fund, and for other purposes incident to the proper conduct of the Association, including the advertising of milk, shall be met by an equal deduction per hundredweight on all milk marketed by the Association for its members. Said deduction shall not exceed three (3) cents per hundredweight, unless additional deductions are approved at an annual or a special meeting of the Association." Before April 1st, 1934, the Association had a reserve fund which had resulted from the fixed assessment provided in the by-laws, and this reserve had been used for the sole purpose of making good to members sums owed by dealers who had become insolvent or unable to pay them. Beginning in April, 1934, the Association, by a vote of the board of directors, began using the reserve fund to make payments for "homeless" milk. By the end of September the fund became so depleted that, in the opinion of the board of directors, it was necessary to levy a special assessment. As a result a vote was passed at a meeting of the voting delegates and directors, as follows: "Moved that under Article II, subsection 9 of the by-laws that this special meeting vote to authorize the Board of Directors to make an additional deduction not to exceed twenty cents per hundred pounds on all milk marketed by the Association for its members. The funds obtained by this deduction to be placed in a special fund to be used exclusively for financing processed milk and to provide a more uniform return to the members of the Association. This deduction to be from October 1, 1934, to January 1, 1935." The directors first fixed the amount of this assessment at twenty cents per hundred pounds, but it was later reduced to ten cents and then to six cents. The defendants and the Dairy Company termi-

nated their contracts with the Association on March 31st, 1935.

In 1917 the Connecticut Milk Producers Association, Inc., was organized in the general form of a joint stock corporation. In 1923 the Legislature passed an act providing for the incorporation of co-operative marketing corporations. Public Acts, 1923, Chap. 251; General Statutes, Rev. 1930, Chap. 194, §§ 3518-3528. The act as originally passed provided that any corporation without capital stock the purposes of which fell within the scope of the act but which had been organized previous to its passage, might avail itself of the statute, and become a corporation under its terms. In 1924 the Association took the steps provided in the act to become a co-operative marketing corporation, filing the necessary papers with the Secretary of the State and these were approved by him in accordance with provisions of the law. In 1932 the existence of the earlier corporation was terminated by legislative act because of its failure to file annual reports. Whether the Association, because of its organization in the form of a joint stock corporation, had the right to bring itself within the scope of the statute concerning co-operative marketing corporations, we have no need to inquire. The articles of association filed in 1924 expressly state its purpose to organize under the provisions of that law, and it has since acted under it; any corporate capacity it had by reason of its organization in 1917, terminated in 1932; it is at least a de facto corporation under the statute as to co-operative marketing corporations; and certainly the defendants, who became and continued members of the corporation and took advantage of its corporate existence by entering into contracts for the sale of their products through it, cannot attack its corporate existence. *West Winsted Savings Bank & Bldg. Asso.* v.

*Ford,* 27 Conn. 282, 289; *DiFrancesco* v. *Kennedy,* 114 Conn. 682, 687, 160 Atl. 72; *Tiernan* v. *Savin Rock Realty Co.,* 115 Conn. 473, 482, 162 Atl. 11; *Pierce County Dairymen's Asso.* v. *Templin,* 124 Wash. 567, 215 Pac. 352.

Under the statutes the Association as a co-operative marketing corporation was authorized to exercise all powers, rights and privileges necessary or incidental to the purposes for which it was formed and to the activities in which it should engage. General Statutes, § 3523. Specifically, it was given power "to establish reserves and invest the funds thereof in such manner as it might deem advisable or as might be provided in [its] by-laws;" General Statutes, § 3523; subject to the provisions of the statute and its certificate of incorporation it might make by-laws, which might contain provisions relating to funds, dues and assessments required of its members; General Statutes, § 3528; and it might enter into marketing contracts with its members which might provide that the corporation should pay to the members the price received for the sale of its products after deducting necessary expenses, including reserves for retiring or redeeming stock and any other necessary reserves or deductions. General Statutes, § 3534. The by-laws of the Association contained the provision concerning assessments and a reserve fund we have already quoted. It thus appears that the Association had the general power to impose assessments upon its members for its expenses or to create a reserve fund.

While one of the claims of law made in the trial court by the defendants raised the question whether the particular assessments involved in this case were made in accordance with a proper method, that matter is not discussed in their briefs in this court and we shall assume that they were. The by-laws pro-

vided that to become a member a person had to be engaged in producing milk for sale in Connecticut and to sign a combined membership and marketing agreement, and pay the prescribed fee. While the terms of the membership contracts between the Association and the producers and between the Association and the Dairy Company are somewhat equivocal, we construe them as constituting the Association an agent of the producer for the sale of the milk, rather than as agreements for the sale of milk by the producer to the Association and resale by the Association to the Dairy Company; indeed, much of the conflict in the terms of the agreements loses significance in view of the provision in the contracts between the producers and the Association by which it is given full power and authority to sell the milk and dairy products in its own name to such parties and at such prices, terms and conditions as it shall consider to be to the best advantage of all members; but we do not consider that in determining the issue before us the question whether the Association became the purchaser of the milk from the producers or their agent to sell and dispose of it, is of significance. The vital issue, then, is whether the assessments made against the defendants were valid in view of the purposes for which they were made.

Neither the statutes nor the articles of association specifically state the purposes for which an assessment may be laid upon members or a reserve fund be created. The by-laws, as already noted, merely provide that the expenses of the Association, including the advertising of milk, shall be met by an equal deduction per hundredweight on all milk marketed by the Association. The question whether the assessments here in question were for a valid purpose must, then, depend upon the determination whether, in the words

of the statute, they were made in the exercise of a power "necessary or incidental" to the purposes for which the corporation was formed or the activities in which it engaged. Among the purposes of the Association stated in its articles are the following. "To promote and encourage the co-operative marketing of milk and milk products; to eliminate or minimize speculation therein and wasteful methods of production, distribution and marketing of the same; to act co-operatively in handling the products and the problems of its members;" and it was further stated: "This Association shall make no profits for itself from any of its activities but all of its operations shall be for the mutual benefit of its members and shall be co-operative in character." It hardly need be pointed out that it is well within the scope of these purposes for the Association to endeavor to find a market for the products of its members.

In determining what action by it is to be recognized as "necessary or incidental" to carrying out its purposes and activities, in the absence of any provision in the statutes, articles of association or by-laws, the terms of the contract which each producer who became a member of the Association made with it, are the best guide. Certainly these defendants, each of whom entered into one of these contracts, are not in a position to attack the exercise of powers by the Association, which are reasonably within the scope of their provisions. Under these contracts they surrendered their own independence of bargaining for the sale of the products and gave to the Association full power and authority in its own name to sell them. The first provision of the contract to which we have referred is significant; the authority given to the Association is not to market the products of each member to his own best advantage, but the Association is to

sell the products in such a way as will be "to the best advantage of all members." One cannot read these contracts without coming to the conclusion that the intent they expressed was that the Association should carry out the purposes stated in its articles "to act co-operatively and collectively in handling the products" of its members, not by promoting such co-operation as might be possible so long as it could be carried on without requiring any member to surrender any particular advantage he might have, but by dealing with the members as a group and calling upon certain of them to surrender something of their own individual advantage in order to improve marketing conditions for those less fortunately situated. Moreover, the method of operation by which the milk delivered to each dealer was pooled and by which payments were made in themselves tended to produce an equality of treatment at least among those who delivered milk to any particular dealer. That provision in the contract between the members and the Association wherein it guaranteed that the members should be paid for all products accepted by the Association if notice were given to it of their failure to receive payment in full within a certain time, is particularly significant; for only by making use of its reserve fund could it make good to members sums owing to them by dealers to whom their milk had been sold and who had become insolvent or unable to make payment. No significant distinction can be drawn between the use of the reserve fund for this purpose and its use to assure a market to the producers of the "homeless" milk at a price reasonably commensurate with that received by other members of the Association.

If we turn to the actual method by which the milk of members of the Association was marketed and paid for, a method in which each of the defendants ac-

quiesced, certain circumstances throw light on the question before us. Whether or not the Association might have directed that all the milk be delivered to it and whether or not, except for the differentials provided, it might have pooled it all and given to each member a return proportionate to the amount of milk sold by it in the various classes, each dealer to whom milk was delivered did just that. The milk delivered by each member was not dealt with as an individual unit, but that of all the members delivering to a particular dealer was treated in common. Under the system in use before April 1st, 1934, the result of that was that the amount of return to each producer was directly affected by the total amount of milk delivered to the dealer by all producers from whom he accepted milk; the effect of acceptance of the milk which later became "homeless" was, on the one hand, to decrease the return to all producers delivering to the dealer who received it, and, on the other, to provide a market for that milk. We are not informed as to the basis upon which the quotas which became effective April 1st, 1934, were fixed; but the purpose evidently was so to regulate the delivery of milk to a dealer as to increase the proportion marketable as fluid milk; and, presumably, had the dealers continued to accept "homeless" milk the quotas of the other producers who delivered to them would have been fixed at a lower amount and their return would have been smaller. There is a very significant omission in the finding; for nowhere does it appear that in fact these defendants, even after the withholding of the assessments in question, actually received less than they would have had the Association in endeavoring to find a market for the "homeless" milk merely persuaded the dealers to continue to accept it, as they had been doing before April 1st, 1934.

It is not necessary in this action to determine whether the Association might have established such a method of payment for milk marketed by it that the return to all producers who were its members in the various parts of the State would be equalized. To a certain extent the assessments made would equalize the return to members of the Association and no doubt this was the reason for including in the vote levying the assessment the statement that the fund was to be used not only for "financing processed milk," but also "to provide a more uniform return to members of the Association." Read in the light of the actual purpose sought to be accomplished, that provision meant no more than that the Association was endeavoring to secure for the producers of certain milk a return reasonably commensurate with that obtained by other members of the Association. The purpose was to secure a market for milk of certain members which otherwise would have had no market except such as it might secure outside the channels afforded by the Association and to make provision for such return. Any equalization of returns which resulted was an incident to that purpose and not the end intended to be accomplished. If the Association found it necessary to assess its members at a reasonable rate to establish a fund to be used for that purpose, that action cannot be held to be not reasonably necessary or incidental to the purposes and activities of the Association. Indeed, it is difficult to see how the defendants can well object, in view of the fact that each of them in the contract he made with the Association gave to it the broad right to "blend" the proceeds from the sale of his milk with those received from the sale of the milk of the other members and, except for differentials, to distribute the money by a uniform method.

Nor can we see that the placing of certain milk

which was in low percentage groups in the processing classification during the months of October and November, 1934, created a situation different in principle from that presented by the method of making compensation for the "homeless" milk, for the effect of this was to give the producers of the milk so treated as processed milk a better return and at the same time, as we understand the finding, by increasing the percentage of milk sold by certain dealers as fluid milk to increase the return to the producers of other milk who delivered to them. The purpose was to secure a fairer compensation for the members whose milk fell within the low percentage groups. The action taken seems quite in line with the system used for determining the amount of payments for the milk of any particular producer upon the basis not of the actual use made of that milk by the dealer, but of the percentage of all the pooled milk which was sold by him in the various classes.

To sum up: At least as regards these defendants it was within the purposes of the Association to seek to manage the marketing of and payment for the milk of its members in such a way as would be to the best advantage of all of them; that purpose would include the providing of a market for milk of all of them; in accomplishing that purpose it might require certain of its members to make reasonable sacrifices of individual advantage in order to benefit other members; the arrangements it made for the sale of the "homeless" milk, on the one hand, afforded its producers a market for it and, on the other, it does not appear that the making of the assessments in question put those subject to them to any greater disadvantage than would have resulted from merely persuading dealers to continue to accept the milk upon the same basis as before; no distinction in principle can be made be-

tween the use of the reserve created by the assessment of three cents per hundredweight provided in the by-laws to pay members for milk delivered to the dealers who were unable themselves to pay for it, a practice in which these defendants apparently acquiesced, and the use of the assessments here in question for the purpose for which they were made. These assessments were reasonably within the statutory authority given the Association to exercise all powers "necessary or incidental" to carry out the purposes for which it was created and the activities in which it engaged.

The defendants claim that assessments, even if within the scope of the powers granted the Association, were illegal upon two grounds: first, that their effect would be to interfere with the power of the milk control board to fix the minimum price which should be paid producers in the State for milk they sold; and secondly, because as the Association was not lawfully organized under the statute as a co-operative marketing corporation and therefore was not entitled to avail itself of the powers granted to such associations, the assessments constituted an illegal restraint upon trade. As to the first objection, it is sufficient to say that, the assessments being such as the Association could lawfully impose upon members as an incident to their membership, they in no way derogated from the powers of the milk control board; the assessments were charges which the members might have been obligated to pay after the receipt of the sums due for the milk they delivered; and the fact that the money was deducted by dealers from those sums before payments were made to the producers, does not alter the legal situation. As to the second objection, we have already pointed out that these defendants, who were members of the Association and had entered into contractual relationship with it as such, cannot rest upon

500

any claim that the Association was not legally organized as a co-operative marketing corporation. Regarded as a legally organized co-operative marketing corporation, and as exercising the powers which are granted to such a corporation by the statutes, its activities are not open to attack as being against the public policy of the State. *Olympia Milk Producers Asso.* v. *Herman,* 176 Wash. 338, 341, 29 Pac. (2d) 676; *Rifle Potato Growers Co-op. Asso.* v. *Smith,* 78 Colo. 171, 177, 240 Pac. 937; *Northern Wisconsin Co-op. Tobacco Pool* v. *Bekkedal,* 182 Wis. 571, 588, 197 N. W. 936; *Warren* v. *Alabama Farm Bureau Cotton Asso.,* 213 Ala. 61, 64, 104 So. 264. See also *Liberty Warehouse Co.* v. *Burley Tobacco Growers Co-op. Asso.,* 276 U. S. 71, 92, 48 Sup. Ct. 291; 8 Thompson, Corporations (3d Ed.) § 6772.

There is no error.

In this opinion the other judges concurred.